**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| GILBERT C. SPAGNOLA, Derivatively on Behalf of Nominal Defendant Ebix, Inc., | Civil Action No. |
| Plaintiff, | |
| PAVAN BHALLA, HANS U. BENZ, HANS UELI KELLER, NEIL D. ECKERT, ROLF HERTER, ROBIN RAINA and ROBERT KERRIS, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants | |
| EBIX, INC., | **DEMAND FOR JURY TRIAL** |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Gilbert C. Spagnola ("Plaintiff"), by the undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia,* a review of public filings with the Securities and Exchange Commission ("SEC"), press releases, news reports, the pleadings and other documents in the action entitled *In re Ebix, Inc. Securities Litigation*, Case No. 11-cv-02400-RWS (N.D. Ga.) (the "Securities Class Action"), and an

investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Ebix, Inc. ("Ebix" or the "Company") against certain of Ebix's current and former directors and officers (the "D&O Defendants," as defined herein) for breaches of fiduciary duties and other violations of law in connection with the issuance of years of materially false and misleading statements concerning the Company's accounting for tax expenses and net income, improper presentation of its purported organic growth, and the inadequacy of Ebix's internal controls over financial reporting.

2.      The D&O Defendants' misconduct was first revealed on March 24, 2011, when *Seeking Alpha* published a scathing report concluding that Ebix had, among other things, misrepresented its business, organic growth, "tax arbitrage" strategy, and the effectiveness of its internal controls.  Then, on June 30, 2011, *Bloomberg* published an article discussing two federal lawsuits filed against Ebix that further highlighted a myriad of accounting and internal control issues at the Company, including the inflation of earnings by overstating accounts receivable, as well as numerous "billing irregularities."  On July 18, 2011, a *Barron's* article

further detailed Ebix's accounting and internal control problems.   Finally, on November 5, 2012, *Bloomberg* reported that the Company was being investigated by the SEC "for its accounting practices."   The article further stated that the SEC investigation, "conducted over the past year, is focused on revenue recognition, internal controls and the accuracy of the company's public statements to shareholders."

3.     As detailed herein, the D&O Defendants have been aware of Ebix's accounting irregularities and its lack of adequate internal controls over financial reporting since at least March 2010.  Despite this knowledge, quarter after quarter, year after year, the D&O Defendants continued to announce and affirm the Company's materially misleading financial results and the adequacy of Ebix's internal controls over financial reporting.

4.     On September 28, 2012, the Court presiding over the Securities Class Action determined that the plaintiffs in that case adequately pled that Ebix and defendants Raina and Kerris had made materially false and misleading statements concerning, *inter alia*, Ebix's tax strategy and effective income tax rate, its organic growth rate, and the adequacy of its internal controls and financial reporting.

5.     The D&O Defendants' misconduct has caused substantial harm to the Company, including, but not limited to, costs and expenses incurred in connection with the SEC investigation.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(a)(2) in that this action states and federal question and Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

7.     Venue is proper in this district because a substantial portion of the transactions and wrongs completed of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintain offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

8.      Plaintiff, a citizen of New Jersey, is a shareholder of Ebix, was a shareholder of Ebix at the time of the wrongdoing alleged herein and has been a shareholder of Ebix continuously since that time.

9.      Defendant Pavan Bhalla ("Bhalla") has served as a director of Ebix and has been Chairman of the Audit Committee of the Board (the "Audit Committee") since June 9, 2004.  Upon information and belief, Bhalla is a citizen of Georgia.

10.     Defendant Hans U. Benz ("Benz") has served as a director of Ebix and as a member of the Audit Committee since 2005.  Upon information and belief, Benz is a citizen of Switzerland.

11.     Defendant Hans Ueli Keller ("Keller") has served as a director of Ebix and as a member of the Audit Committee since July 26, 2004.  Upon information and belief, Keller is a citizen of Switzerland.

12.     Defendant Neil D. Eckert ("Eckert") has served as a director of Ebix and as Chairman of the Corporate Governance and Nominating Committee of the Board (the "Governance Committee") since 2005.  Upon information and belief, Eckert is a citizen of the United Kingdom.

13.     Defendant Rolf Herter ("Herter") has served as a director of Ebix and as a member of the Governance Committee since 2005.  Upon information and belief, Herter is a citizen of Switzerland.

14.     Defendant Robin Raina ("Raina") has served as a director of Ebix since 2000, as Chairman of the Board since May 2002, and as the Company's Chief Executive Officer ("CEO") since 1999. Upon information and belief, Raina is a citizen of Georgia.

15.     The defendants identified in ¶¶ 9-14 are collectively referred to herein as the "Director Defendants."

16.     Defendant Robert Kerris ("Kerris") has served as the Company's Chief Financial Officer ("CFO") since October 2007.  Upon information and belief, Kerris is a citizen of Georgia.

17.     The Director Defendants and defendant Kerris are collectively referred to herein as the "D&O Defendants."

18.     Nominal Defendant Ebix is incorporated in Delaware and maintains its principal offices at 5 Concourse Parkway, Suite 3200, Atlanta, Georgia 30328. As a result, Ebix is a citizen of Delaware and Georgia.  According to public filings, Ebix "is a leading international supplier of software and e-commerce solutions to the insurance industry."

## DUTIES OF THE D&O DEFENDANTS

### The D&O Defendants' Fiduciary Duties

19.     By reason of their positions as officers, directors, and/or fiduciaries of Ebix and because of their ability to control the business and corporate affairs of Ebix, the D&O Defendants owed Ebix and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Ebix in a fair, just, honest, and equitable manner. The D&O Defendants were and are required to act in furtherance of the best interests of Ebix and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Ebix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

20.     The D&O Defendants, because of their positions of control and authority as directors and/or officers of Ebix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts and public statements complained of herein.

21.    To discharge their duties, the officers and directors of Ebix were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Ebix were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's disclosures regarding its business, financial performance, and internal controls were truthful and accurate; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

22.    Further, all employees of Ebix, including the D&O Defendants, were required to comply with the Company's Code of Conduct (the "Code of Conduct") (dated June 2009).  As detailed in the Company's proxy statements, the Board of Directors "has adopted a Code of Conduct, articulating standards of business and professional ethics, which is applicable to all of our directors, officers and

employees."  The Code of Conduct states that defendant Kerris was designated as Ebix's "Corporate Compliance Officer," and that he had the "ultimate responsibility for overseeing compliance with applicable laws, this Code of Conduct, and all related Ebix policies and procedures…"  Further, defendant Kerris was designated "to oversee internal monitoring and self-evaluation programs relating to Ebix's legal and regulatory obligations to ensure a broad and consistent interpretation of our compliance objectives."  The Code of Conduct states that any investigations related to "a violation of applicable laws, this Code of Conduct or any of Ebix's policies and procedures" would be conducted by (and under the supervision of) defendant Kerris:

> [U]nless the violations are alleged to have been committed by the Corporate Compliance Officer or the Chief Executive Officer, in which case, the investigations will be conducted by, and under the supervision of the Audit Committee. However, if any alleged violation involves accounting, internal accounting controls or auditing, you should report that matter in accordance with the procedures established by the Audit Committee of the Board of Directors.

23.    The Code of Conduct also states, with respect to "Business Practices," in relevant part:

> Any employee having (1) information or knowledge of any hidden fund or asset, any false or artificial entry in Ebix's books and records or any inappropriate payment, or (2) any complaint or concern about a questionable practice regarding accounting, internal accounting controls or auditing matters

should promptly report the matter in accordance with the procedures established by the Audit Committee of the Board of Directors. Employees may submit such information anonymously, and the Audit Committee will keep the identity of the source of such complaint confidential.

More generally, all Ebix employees, officers and directors should perform their responsibilities with a view toward causing Ebix's public communications, including periodic and other reports [filed] by Ebix with the Securities and Exchange Commission, to be made on a timely basis and to contain disclosure that is full, fair, accurate and understandable.

24.     The D&O Defendants, and in particular Raina (Ebix's CEO), Kerris (Ebix's CFO) and Audit Committee members Bhalla, Benz and Keller, were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.

25.     Additionally, defendants Raina and Kerris were under a duty to adhere to Ebix's "Code of Ethics for Senior Financial Officers" (the "Code of Ethics").  The Code of Ethics, adopted by the Board of Directors, is applicable to the Company's CEO, CFO, Corporate Controller "and any other persons designated as senior financial officers."   The Code of Ethics states that these "Senior Financial Officers will promptly bring to the attention to the Audit Committee," among other things:

(a)     Material information that calls into question disclosures made by the Company in its filings with, or submissions to, the Securities and Exchange Commission or in other public communications;

(b)     Information concerning significant deficiencies or material weaknesses in the design or operation of the Company's "internal control over financial reporting" or other factors that could adversely affect the Company's ability to record, process, summarize and report financial data; and

(c)     Information regarding any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

26.     With respect to financial records and periodic reports, the Code of Ethics required that the Senior Financial Officers "establish and manage the enterprise transaction and reporting systems and procedures" to provide that:

(a)     Business transactions are properly authorized and accurately and timely recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles (GAAP) and policies established by the Company;

(b)     False or artificial statements are not made in the Company's books and records, financial statements and related communications;

(c)     The retention or disposal of Company records is in accordance with applicable legal and regulatory requirements and any records retention policies established by the Company; and

(d)     Reports and documents filed by the Company with, or submitted by the Company to, the Securities and Exchange Commission, as well as other public communications made by

the Company, include full, fair, accurate, timely and understandable disclosure.

***Additional Duties of the Audit Committee Members***

27.     In addition to their duties as Board members, members of the Audit Committee possessed certain additional duties by virtue of their positions on the Audit Committee.  These duties are set forth in the Audit Committee's charter (the "Audit Committee Charter").

28.     According to the Audit Committee Charter, the Audit Committee's purpose is to "oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements, and shall otherwise exercise oversight responsibility, and assist the Board in fulfilling its oversight functions, with respect to matters involving the accounting, auditing, financial reporting and internal control functions of the Company."

29.     With respect to the Audit Committee's scope of responsibilities, the Audit Committee Charter states that the Audit Committee "plays a critical role in serving as a check and balance for the Company's financial reporting system. In carrying out its functions, the Committee's goal is to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices."

30.     According to the Audit Committee Charter, the Audit Committee's responsibilities with respect to the "Audit Process" require that members:

(a)     Be directly responsible for the appointment, compensation, retention and oversight of the work of the Auditors, including resolution of disagreements between management and the Auditors regarding financial reporting, for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Auditors shall report directly to the Committee;

(b)     On an annual basis, review the Auditors' independence and objectivity by (i) inquiring into matters such as all relationships between the Auditors and the Company and (ii) reviewing annual disclosures from the Auditors regarding their independence as required by Independence Standards Board Standard No. 1.

(c)     On an annual basis, obtain and review a report from the Auditors concerning their internal quality control review of the firm, any inquiry or investigation by governmental or professional authorities within the preceding five (5) years respecting one or more independent audits carried out by the firm and any steps taken to address material issues raised by such review or any such inquiry or investigation; and

(d)     Following completion of the annual audit, review separately with the Company's management and the Auditors the effectiveness of the audit effort, including significant difficulties encountered during the course of the audit and any restrictions on the scope of work or access to required information.

31.     Finally, with regard to "Risk Management and Controls," the Audit Committee Charter details the following responsibilities of the Audit Committee:

(a)   Inquire of the Auditors and the Company's management about significant risks or exposures and assess the steps which management has taken to minimize such risks and monitor control of these areas;

(b)   Review and monitor compliance with the Company's Code of Ethics for Senior Financial Officers;

(c)   Review with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment, including management's controls and security procedures with respect to the Company's information systems; and

(d)   Review with the Auditors and the Company's management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented. This review will be conducted at an appropriate time subsequent to the implementation of changes or improvements, as decided by the Committee.

32.   Additionally, according to the Company's proxy statements, the Audit Committee "exercises oversight responsibility regarding the quality and integrity of our auditing and financial reporting practices and our internal controls. In discharging this responsibility, the Audit Committee, among other things, holds the authority the independent registered public accounting firm, to pre-approve the audit and any non-audit services to be provided by the auditors and reviews the results and scope of the annual audit performed by the auditors."

## SUBSTANTIVE ALLEGATIONS

33.     Ebix was founded in 1976 as Delphi Systems, Inc., and changed its name to Ebix in December 2003.  According to public filings, Ebix "is a leading international supplier of software and e-commerce solutions to the insurance industry. Ebix provides a series of application software products for the insurance industry ranging from carrier systems, agency systems and exchanges to custom software development for all entities involved in the insurance and financial industries."  Through the years, Ebix has sought to expand its business, in large part, by acquiring complementary companies.

### *False and Misleading Statements*

34.     As discussed in detail below, the D&O Defendants were responsible for disseminating numerous false and misleading statements concerning the Company's internal controls and profitability since at least 2010.  In particular, the D&O Defendants knowingly caused or allowed the Company to:

  (a)     Repeatedly assure shareholders that the Company's internal controls were adequate and effective, when the D&O Defendants knew that was not true; and

  (b)     Report quarterly and annual financial results that the D&O Defendants knew were materially inflated as a result of the Company's improper accounting for tax expenses, net income, and presentation of its organic growth rate.

35.    The D&O Defendants knowingly caused or allowed the Company to issue false and misleading statements in press releases, Form 10-Q filings, Form 10-K filings, and conference calls from at least March 8, 2010 through the present, including the following:

(a)    March 8, 2010 press release and conference call announcing fiscal 2009 full year financial and operational results;

(b)    March 16, 2010 Form 10-K filing, which was signed by each of the D&O Defendants and certified by defendants Raina and Kerris;

(c)    May 7, 2010 press release and conference call announcing fiscal 2010 first quarter financial and operational results;

(d)    May 10, 2010 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(e)    August 9, 2010 press release and conference call announcing fiscal 2010 second quarter financial and operational results;

(f)    August 9, 2010 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(g)    November 9, 2010 press release and conference call announcing fiscal 2010 third quarter financial and operational results;

(h)    November 9, 2010 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(i)    March 14, 2011 press release and conference call announcing fiscal 2010 full year financial and operational results;

(j)     March 16, 2011 Form 10-K filing, which was signed by each of the D&O Defendants and certified by defendants Raina and Kerris;

(k)     March 25, 2011 press release entitled "Ebix Responds to Stock Price Drop";

(l)     May 10, 2011 press release and conference call announcing fiscal 2011 first quarter financial and operational results;

(m)     May 10, 2011    Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(n)     July 15, 2011 press release entitled "Ebix Makes Key Announcements";

(o)     August 9, 2011 press release and conference call announcing fiscal 2011 second quarter financial and operational results;

(p)     August 9, 2011 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(q)     November 8, 2011 press release and conference call announcing fiscal 2011 third quarter financial and operational results;

(r)     November 9, 2011 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(s)     March 13, 2012 press release and conference call announcing fiscal 2011 full year financial and operational results;

(t)     March 15, 2012 Form 10-Q filing, which was signed by each of the D&O Defendants and certified by defendants Raina and Kerris;

(u)     May 8, 2012 press release and conference call announcing fiscal 2012 first quarter financial and operational results;

(v)     May 10, 2012 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(w)     August 7, 2012 press release and conference call announcing fiscal 2012 second quarter financial and operational results;

(x)     August 9, 2012 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris;

(y)     November 8, 2012 press release and conference call announcing fiscal 2012 third quarter financial and operational results; and

(z)     November 9, 2012 Form 10-Q filing, which was signed and certified by defendants Raina and Kerris.

36.     The Director Defendants were also responsible for disseminating from 2010 to 2012 numerous false and misleading proxy statements soliciting shareholder approval of the reelection of the Director Defendants, ratification of Cherry, Bekaert & Holland LLP ("CB&H") as the Company's registered accounting firm, and shareholder approval of The Ebix, Inc. 2010 Stock Incentive Plan (the "Stock Incentive Plan").  In particular, on October 8, 2010, the Director Defendants knowingly caused or allowed the Company to file with the SEC and disseminate to shareholders a Form 14-A proxy statement soliciting shareholder approval of the reelection of the Director Defendants; shareholder approval of the Stock Incentive Plan providing for the issuance of up to 5 million common share awards that could be awarded to recipients (including stock options, non-qualified

stock options, stock appreciation rights, restricted stock units, restricted stock and shares of unrestricted stock); and shareholder ratification of CB&H as the Company's independent auditor for the 2010 fiscal year.

**The Truth Emerges**

37.     On March 24, 2011, *Seeking Alpha* published a scathing report by Copperfield Research entitled "Ebix: Not a Chinese Fraud, But a House of Cards Nonetheless" (the "Copperfield Report").  The Copperfield Report detailed, among other things, Ebix's misrepresentations regarding its business, "phantom organic growth" and "tax arbitrage" strategy, as well as the effectiveness of its internal controls over financial reporting.  The Copperfield Report also detailed the Company's "history of auditor turnover, shockingly low audit fees and accounting red flags."

38.     With respect to Ebix's "potentially illegal tax strategy and impact on earnings and valuation," the Copperfield Report stated that "we believe aspects of Ebix's tax provisions do not conform to GAAP and could result in a restatement (if the company had an auditor with the resources to scrutinize this accounting treatment)."  The Copperfield Report went on to detail how Ebix's use of a net operating loss against its deferred tax assets "should have been reversed years ago and this accounting treatment suggests a lack of oversight from auditors and

possible earnings manipulation." Additionally, the Copperfield Report discussed how the Company wrongfully employed a "controversial tax transfer strategy to shift U.S. income to India and Singapore" despite the fact that Ebix generated 75 percent of revenue in the U.S. and "minimal revenue from India and Singapore." The Copperfield Report continued, "Through a transfer tax mechanism, Ebix has shifted most of its U.S. income to its foreign operations … [t]hrough this superficial series of transactions that pose no business purpose other than to avoid U.S. taxes."

39.    The Copperfield Report also discussed how, through "various accounting tricks," Ebix's earnings "appear to be managed" through manipulation of accounts receivables, allowance for doubtful accounts, and a "large amount of goodwill and intangibles that does not flow through the income statement."

40.    Following the release of the Copperfield Report, on March 25, 2011, the D&O Defendants caused the Company to issue a press release assuring investors that all was well, and refuting "the random implications in a recent blog posted on Seeking Alpha about the Company. … It is management's opinion that this post misrepresents and distorts facts not relevant to the Company's current financial position, long-term growth prospects and management policies."

41.  On June 30, 2011, *Bloomberg* published an article entitled "Ebix Inflated Earnings by Ignoring Bad Debt, Court Is Told."  The article discussed two federal lawsuits filed against Ebix that had further highlighted a myriad of accounting issues at Ebix, including the inflation of earnings by overstating accounts receivable, as well as numerous "billing irregularities."  *See Isaac v. Ebix Inc.*, No. 11-cv-00459 (S.D. Ohio) and *Irving v. Ebix Software, et al.*, No. 10-cv-00762 (S.D. Cal.).

42.  On July 18, 2011, *Barron's* published an article about the Company entitled "Prolonging A Foreign Tax Holiday."  The *Barron's* article further detailed Ebix's frequent change in accounting firms (as discussed above in the Copperfield Report), in relevant part, as follows:

> After the unfortunate 1999 audit by Arthur Andersen, the company was audited by KPMG, until that firm resigned in 2004, noting five kinds of accounting deficiencies. The next auditor, BDO Seidman, also found "significant deficiencies" in its first audit. Two years later, Ebix dismissed BDO -- saying it needed an Atlanta-based firm.

> One thing stands out: As Ebix has gotten larger, its audit firms have gotten smaller. The company's globe-spanning financial activities have been audited for the last four years by Cherry, Bekaert & Holland. Raina notes that CB&H is the second-largest accounting firm headquartered in the Southeast. The SEC's Edgar database shows the firm has worked on the employee-benefit plans of a few big companies, but its corporate-audit clients are mostly penny stocks and micro-cap companies. In an e-mail, Raina says that the CB&H audit team

has decades of experience in audits and tax work with large international accounting firms. "The Ebix audit committee reviews auditors every year," he adds. "For the sake of continuity, our audit committee has preferred to not change to a Big Three firm too suddenly."

*       *       *

Raina says that Ernst & Young International has ensured that Ebix follows India's regulations in its transfer payments. "The government has given a pretty good tax rate to us," says Raina. "We are not running a tax shelter."

Another interesting thing about Ebix's subsidiaries in India is that there are two of them. Through 2008, the U.S. company's rising stream of payments to India went to a unit called Ebix Software India Private Ltd., which enjoyed a tax-free holiday as a new software-export business. As the holiday was approaching its end, Ebix incorporated a second Indian unit, Ebix Software Asia SEZ Private Ltd. Payments to the first subsidiary plunged -- by 43% in 2009, then another 68% in 2010 -- while payments tripled to the new unit, whose tax holiday will run to 2015. We asked Raina the business purpose of this switch. He said the newer corporation was in a location with room to grow and centralize India operations.

Auditing the large portion of Ebix financials that flow through India is a small Delhi firm called Baweja & Kaul. The Public Company Accounting Oversight Board (PCAOB), a U.S. accounting regulator, has inspected many audit firms in India; B&K isn't one of them. …

According to the detailed financial records available in India, B&K's audit of Ebix's $38 million Indian business last year only set the company back about $9,000 -- much less than the two units spent on holiday gifts for the Diwali "festival of lights." Barron's asked Raina how U.S. auditor Cherry, Bekaert & Holland supervises the Indian audit. In the past year, the accounting regulators at the PCAOB have expressed great

concern about the ability of small U.S.-based auditors to properly audit businesses in distant parts of the world (the PCAOB identified no specific firms, in its warning). "All auditors test the work of overseas auditors," he reassured us by e-mail.

43.    The July 18, 2011 *Barron's* article further detailed Ebix's tax strategy,

in relevant part, as follows:

> Raina has created shareholder value through a train of acquisitions that brought aboard software revenue and tens of millions in net-operating-loss carryforwards to reduce taxes. The acquired products became profitable when Ebix relocated software support and development to its workers in Singapore and India, where almost two-thirds of Ebix employees now reside. As a result, Ebix' operating-profit margins are 40%. Revenues grew 35% in 2010 to more than $130 million, producing net income of $59 million, or $1.51 a share. Per-share earnings rose 16% in the March 2011 quarter. Investors will learn the June results on Aug. 9.

> In the blur of 18 acquisitions, it's been hard to distinguish acquired growth from organic growth. Raina says that 11 percentage points of last year's revenue growth were organic. What really matters, he argues, is that cash flow has grown. In 2010, free cash flow (after acquisitions and capital spending) was $33 million, or about 85 cents a share. "Our cash-generating rate continues to increase," Raina told Barron's in an interview last Tuesday. "The story of Ebix is a cash story."

>                *     *     *

> The tax-savings from Ebix's intracompany transactions with its subsidiaries in Singapore and India have been crucial to the cash flow and profit that Raina's produced at the U.S. parent. There are many U.S. multinational firms that have been criticized for their use of international tactics to reduce their taxes -- companies such as General Electric (GE) and this

23

weekly's publisher, News Corp. (NWSA). Still, Ebix merits attention. The solidly profitable software outfit's effective tax rate in 2009 was 2.5%. In 2010 it was 1.1%.

Those tiny tax bites reflect Ebix's deft use of the acquired tax-loss carryforwards. The company's "transfer payments" to its foreign subsidiaries are the other leg of its tax strategy. Profits that Ebix can report earning in Singapore are taxed at 10%. Profits reported in India are taxed at 0%, under that nation's Software Export Zone Act. The table on page 22 shows that those units' charges to the U.S. parent produced the curious result whereby Ebix foreign operations reported a 2009 profit of 104% of their revenues, while 2010 profits were 139%.

India requires all businesses to publicly file financial results with the government. According to those filings, the company's two Indian subsidiaries reported about $38 million in revenue from other Ebix units in 2010 (although the U.S. parent's 10-K shows net revenue in India of zero). Cash transactions with the India unit didn't seem to follow those $38 million in reported revenues very closely. At the end of 2010, outstanding receivables from the rest of Ebix amounted to almost a year's worth of the Indian units' sales -- a pretty high level of days' sales outstanding. At one point in 2010, in fact, receivables due from the U.S. parent ballooned to almost three years' worth of one Indian subsidiary's sales. The more handsomely Ebix U.S. pays its subsidiaries in India, of course, the lower the company's taxes. Those subsidiaries showed pretax profit margins as high as 89%.

Financial filings for Ebix's oldest Indian subsidiary show several years in which receivables from Ebix U.S. swelled beyond a year's sales -- but Raina told Barron's that was not true. "We were following a policy of clearing all intercompany [accounts receivable] with India within 365 days, which is within the guidelines laid out by Reserve Bank of India," he wrote in an e-mail. Receivables in India are now down to $2 million, or less than 100 days of sales, he added, and, going

> forward, Ebix intends to clear all receivables with India within 120 days.

44.     On November 5, 2012, *Bloomberg* reported that Ebix "is being investigated by the U.S. Securities and Exchange Commission for its accounting practices, four people with direct knowledge of the probe said.   The SEC investigation, conducted over the past year, is focused on revenue recognition, internal controls and the accuracy of the company's public statements to shareholders…."

### Each of the D&O Defendants Knew of the Company's False and Misleading Statements and Deficient Internal Controls

45.     The D&O Defendants knew that the statements set forth in ¶ 35 were materially false and misleading when made because Ebix had: (1) improperly accounted for its tax expenses, thereby artificially inflating its reported net income; (2) improperly presented the degree of organic growth purportedly achieved by the Company; and (3) falsely stated that the Company possessed adequate internal and financial controls when it did not.

46.     In addition, the proxy statement identified in ¶ 36 was false and misleading when issued because it failed to disclose that CB&H had given Ebix's financial statements an unqualified audit opinion regarding the Company's financial statements and internal control over financial reporting even though

CB&H, as well as each of the D&O Defendants, knew that the Company's financial statements were false and misleading.

47.     Defendants Raina and Kerris and Audit Committee members Bhalla, Benz and Keller were intimately aware of the accounting improprieties and lack of adequate internal controls over financial reporting at Ebix.  Through their positions as executive officers or members of the Audit Committee, these defendants were engaged in (at the very least) annual discussions with the Company's auditing firms, and were privy to information from those firms regarding their examination of the Company's accounting and internal controls. Further, the members of the Audit Committee were required to:

(a)     Inquire of the Auditors and the Company's management about significant risks or exposures and assess the steps which management has taken to minimize such risks and monitor control of these areas;

(b)     Review and monitor compliance with the Company's Code of Ethics for Senior Financial Officers;

(c)     Review with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment, including management's controls and security procedures with respect to the Company's information systems; and

(d)     Review with the Auditors and the Company's management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been

implemented. This review will be conducted at an appropriate time subsequent to the implementation of changes or improvements, as decided by the Committee.

48.     In fulfilling their responsibilities as members of the Audit Committee, defendants Bhalla, Benz and Keller were privy to discussions with defendants Raina and Kerris about the Company's accounting practices and internal control deficiencies.  Defendants Bhalla, Benz and Keller were also privy to discussions with the Company's numerous auditing firms over the years wherein they discussed the Company's accounting practices and internal control deficiencies.

49.     Moreover, since 2003 the Company has engaged no less than four registered accounting firms to opine on its financial statements, and just recently, the effectiveness of its internal controls over financial reporting.  This includes such top tier accounting firms (when Ebix was a smaller company) as KPMG (from 2003 until its resignation in June 2004 after reporting significant internal control deficiencies) and BDO Seidman (from June 2004 until it was fired by the Company in April 2007), as well as smaller accounting firms (as Ebix grew in size and accounting complexity) Habif, Arogeti & Wynne, LLP ("HA&W") (from 2007 until it resigned as auditor in December 2008) and Cherry, Bekaert & Holland, LLP (CB&H") (from 2008 through the present).

50.     Members of the Board of Directors, and in particular CEO and Chairman of the Board Raina and Audit Committee members Bhalla, Benz and Keller, were intimately aware of the accounting misstatements presented to investors and the lack of adequate internal financial controls at Ebix.   These defendants consciously caused the Company, when presented by its auditors with significant problems identified in the Company's internal controls, to publicly declare that they had made changes and improvements to the internal controls, but then shortly thereafter retain a different independent auditor.   This practice continued until these defendants found an auditor who would be sufficiently lax to issue unqualified audit opinions regarding the Company's financial statements and internal controls over financial reporting.

51.     Further examples of the Company's deficient accounting practices and internal controls are illustrated in a May 2011 federal lawsuit filed against Ebix by the former owners of Peak Performance Solutions ("Peak"), which Ebix acquired in September 2009.[1]   In that case, the former owners of Peak provided specific examples of how, after acquiring Peak, Ebix "systematically and repeatedly breached" the purchase agreement.   Among other things, Ebix: 1) was unable to provide them with certified financial statements; 2) failed to institute appropriate

---

[1]      *Isaac v. Ebix, Inc.*, No. 2:11-cv-0450 (S.D. Ohio).

accounting policies to allow for an audit of financial performance; and 3) failed to collect receivables owed to Peak. Additionally, the complaint in the Peak matter details how "Ebix's accounting procedures were plagued with errors. Ebix was consistently unable to properly bill customers, tie customer payments to invoices, provide basic financial data…." Further, the complaint details how financial information provided by defendant Kerris to Peak was "substantially flawed," and how "Ebix's own CFO and Controller [were] unable to agree on Peak's revenue for 2010."

### Denial of the Motion to Dismiss the Securities Class Action

52.     On September 28, 2012, United States District Court Judge Richard W. Story issued an order in the Securities Class Action denying defendants Ebix, Raina and Kerris' motions to dismiss the Consolidated Amended Complaint. Judge Story held, among other things:

> a.     "Specific facts alleged in the [consolidated amended complaint] contradict [the] representations by Defendants about the strength of Ebix's internal controls and the company's accounting and billing practices;"
>
> b.     "Defendants failed during the Class Period to record an adequate tax expense and misled investors about Ebix's foreign tax holiday benefits;" and
>
> c.     "[F]acts alleged in the [consolidated amended complaint] indicate that Ebix's organic growth was not nearly [as strong as represented], if it was occurring at all."

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

53.     Plaintiff brings this action derivatively in the right and for the benefit of Ebix to redress injuries suffered, and to be suffered, by Ebix as a direct result of the D&O Defendants' misconduct.

54.     Plaintiff will adequately and fairly represent the interests of Ebix in enforcing and prosecuting its rights.

55.     Plaintiff is a shareholder of Ebix, was a shareholder of Ebix at the time of the wrongdoing alleged herein and has been a shareholder of Ebix continuously since that time.

56.     Plaintiff did not make a pre-suit demand on the Board because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, as set forth below.

57.     The Board consists of the six Director Defendants, Raina, Bhalla, Benz, Keller, Eckert and Herter, none of whom is capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.  Each of the Director Defendants, particularly CEO and Chairman of the Board Raina and Audit Committee members Bhalla, Benz and Keller, knowingly caused or allowed the Company consistently to misrepresent its financial results and the adequacy and effectiveness of its internal controls, as alleged herein, and

therefore they each face a substantial likelihood of being held liable for their misconduct.

## COUNT I

### AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATION OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934

58.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

59.     Rule 14-A-9, promulgated pursuant to §14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14-A-9.

60.     Ebix's 2010 proxy statement described herein violated §14(a) and Rule 14-A-9 because it contained false and misleading statements and omitted material information necessary in order to make the statements therein not false or misleading, as alleged herein.

61.     The misrepresentations and omissions in the 2010 proxy statement were material and were an essential link in the Director Defendants re-election as directors of the Company and in the approval of the.

62.     As a direct and proximate result of the foregoing violations of §14(a) and Rule 14-A-9, Ebix is entitled to equitable and injunctive relief, including, but not limited to, an order invalidating the shareholder vote on the Stock Incentive Plan.

## COUNT II

### AGAINST THE D&O DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

63.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64.     As alleged in detail herein, each of the D&O Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's disclosures regarding its business, financial performance, and internal controls were truthful and accurate.

65.     The D&O Defendants breached their fiduciary duties of loyalty and good faith by knowingly causing or allowing the Company improperly to account for and report its tax expenses and net income, and by falsely stating that the Company had adequate internal and financial controls when it did not.

66.     As a direct and proximate result of the D&O Defendants' foregoing breaches of fiduciary duties Ebix has sustained damages, including, but not limited

to, costs and expenses incurred in connection with the SEC's investigation of the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Against the D&O Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of their misconduct;

B.   Granting appropriate preliminary and permanent injunctive relief, including, but not limited to, an order invalidating the shareholder vote on the Stock Incentive Plan and prohibiting the issuance of incentive awards pursuant to the invalidly approved Stock Incentive Plan;

C.   Granting additional appropriate equitable relief to remedy Defendants' misconduct;

D.   Awarding Plaintiff the costs and disbursements of the action, including reasonable allowance of fees for Plaintiff's attorneys, experts and accountants; and

E.   Granting Plaintiff such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 7, 2013

LAW OFFICE OF JOSHUA A.
MILLICAN, P.C.

Joshua A. Millican
Georgia Bar No. 508998
The Grant Building, Suite 607
44 Broad Street NW
Atlanta, GA 30303
Tel:  (404) 522-1152
Fax:  (404) 522-1133
joshua.millican@lawofficepc.com

KESSLER TOPAZ
MELTZER & CHECK, LLP
Eric L. Zagar
Robin Winchester
280 King of Prussia Road
Radnor, Pennsylvania  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
ezagar@ktmc.com
rwinchester@ktmc.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Gilbert Spagnola, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: 12/27/12

**Gilbert Spagnola**