UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| IN RE EBIX, INC. DERIVATIVE LITIGATION | File No. 1:13-CV-62 (RWS) |

**CONSOLIDATED SHAREHOLDER DERIVATIVE
AND CLASS ACTION COMPLAINT**

Lead Plaintiff, by its undersigned attorneys, for its consolidated shareholder derivative and class action complaint, alleges upon information and belief, except as to allegations about itself, which are based upon its own knowledge, as follows:[1]

## I.   SHAREHOLDER DERIVATIVE AND CLASS ACTION

1.   Lead Plaintiff Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund ("Hotel Trades"), brings this action derivatively on behalf of Nominal Defendant Ebix, Inc. ("Ebix" or "the Company"), and on behalf of a Class of Ebix shareholders.

---

[1]  This Consolidated Amended Complaint is filed as a result of the Court's April 12, 2013 Order consolidating two separate cases, *Spagnola v. Raina, et al.*, 1:13-CV-62-RWS and *Hotel Trades and Hotel Association of New York City Inc. Pension Fund v. Raina et al.*, 1:13-CV-246-RWS, and appointing Hotel Trades as Lead Derivative Plaintiff, and with the consent of defendants. Spagnola has withdrawn as a plaintiff in the consolidated action.

2.     As alleged herein, the Individual Defendants engaged in an extensive pattern of misconduct and a complete abandonment of their fiduciary duties to the Company and its shareholders.   The Individual Defendants willfully disregarded the Company's pervasive internal control problems, engaged in a manipulative tax avoidance scheme, and drastically overstated the Company's prospects for future organic growth.  Further, the Individual Defendants caused the Company to waste millions of dollars by repurchasing Ebix shares at a time when the stock was artificially inflated due to the Company's materially false and misleading statements.  Finally, Individual Defendants Herter, Bhalla, Keller, Benz, and Eckert exercised stock options and improperly disposed of a portion of the exercised shares at $16.74 while in possession of non-public information concerning an active ongoing SEC investigation that the Company denied the existence of until it filed its first quarter 2013 10-Q on May 10, 2013.

3.     The Individual Defendants' breaches of their fiduciary duties resulted in drastic stock drops, numerous lawsuits and regulatory investigations, and severe damage to the Company's reputation.  Faced with almost certain personal liability and a Company whose reputation and credibility was fast-declining, the Individual Defendants orchestrated a sale of the Company to affiliates of Goldman Sachs, Inc. ("Goldman Affiliates") for an inadequate price.  The sale of

Ebix was designed to extinguish the Individual Defendants' personal liability in connection with the derivative claims, while simultaneously allowing them to reap significant financial benefits. All of the stock options held by the Individual Defendants will accelerate and vest in connection with the transaction and they will immediately cash out those positions, netting them millions of dollars. Furthermore, by virtue of this transaction and his change in control bonus, Defendant Raina will significantly increase his ownership interest in the Company. Defendant Raina will receive tens of millions of dollars in change-in-control payments and own 14% of the Company post-merger. Raina will also remain the CEO of the Company. Additionally, Defendant Herter by virtue of his position as a Director of the Rennes Foundation, will have a 15% interest in the Company post-merger.

4.      Accordingly, Lead Plaintiff brings this action derivatively on behalf of the Company to recoup damages resulting from the Individual Defendants' misconduct, and Plaintiff brings this action on behalf of a Class of Ebix shareholders to enjoin the sale of the Company to the Goldman Affiliates under the terms negotiated by the Individual Defendants at an unfair price and to avoid liability for their wrongdoing.

## II.    NATURE AND SUMMARY OF THE ACTION

From May 2009 through at least June 30, 2011, the Individual Defendants breached their fiduciary duties to shareholders by falsely portraying the financial condition of the Company. The Individual Defendants reported ever increasing net income and revenues due to favorable tax treatment and projected continued and significant organic growth. In reality, however, Ebix's internal controls were in shambles, the so-called "favorable" tax treatment was the result of a manipulative tax scheme, and the Company's organic growth rate was minimal as its growth was being driven by numerous acquisitions.

5.     Given the seriousness of the misleading financial statements and reporting, it was only a matter of time before the truth seeped into the market. On March 24, 2011 a research report filed by Copperfield Research, entitled *Ebix: Not a Chinese Fraud But a House of Cards Nonetheless* (the "Copperfield Report") revealed the significant financial problems at the Company. The Copperfield described the Company as "a riddle wrapped in a mystery inside an enigma," and raised serious questions about the integrity of Ebix and its reported financial results, including allegations that Ebix (a) suffered from material internal control weaknesses, (b) employed an improper and potentially illegal tax avoidance scheme involving its foreign subsidiaries to reduce tax liability and

inflate earnings, and (c) misrepresented the source of its purportedly organic revenue growth.

6.   The Copperfield Report was just the beginning of the Company's legal woes.  On May 24, 2011, the former shareholders of Peak Performance Solutions, Inc. ("Peak"), a company acquired by Ebix in September 2009, sued Ebix for breach of contract and fraud in connection with the share purchase agreement.  The allegations in the complaint were similar to those made in the Copperfield Report.  Ultimately, the Peak shareholders sought an "earn-out" payment from Ebix that they claimed Ebix had failed to pay.  The Peak complaint included detailed allegations that Ebix had overstated its revenues, and that its internal controls were in shambles.

7.   As news of the Copperfield report and the Peak lawsuit entered the market, Ebix's share price substantially declined, dropping from over $28 in late March of 2011 to approximately $19 per share as of June 30, 2011, when *Bloomberg* published a detailed story on the Peak litigation.

8.   Furthermore, on July 21, 2011, certain purchasers of Ebix stock sued Ebix, its Chairman and Chief Executive Officer ("CEO") Robin Raina ("Raina"), and its Chief Financial Officer ("CFO") Robert Kerris ("Kerris"), alleging violations of the federal securities laws.  That action is captioned <u>In re Ebix, Inc.</u>

Securities Litigation, Civil Action No. 11-CV-02400-RWS (N.D. Ga.) (the "Class Action"). The Class Action consolidated amended complaint, filed in this Court on November 28, 2011, is based in part on the matters raised in the Copperfield Report and the Peak litigation.  The consolidated amended complaint alleges that during the period May 6, 2009 through June 30, 2011, defendants made materially false and misleading statements to the market that artificially inflated Ebix's stock price.

9.   By order dated September 20, 2012, this Court upheld the Class Action plaintiffs' allegations against a motion to dismiss, holding that the plaintiffs had satisfied the rigorous pleading standards for securities fraud imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). This Court held that the plaintiffs had "pled misrepresentations and omissions of material fact with sufficient particularity to satisfy the PSLRA's standards" and that defendants had acted with scienter, or intent to defraud stock purchasers. The Court also upheld the plaintiffs' allegations that their investment losses in Ebix stock were attributable to the disclosure of defendants' alleged fraud.

10.  The Class Action claims described above have exposed Ebix to potentially massive liability to the stock purchaser class and have damaged the Company's goodwill and reputation.  In addition, as alleged herein, during the

fiscal years that the Company was issuing misleading statements, and Defendants were breaching their duties of disclosure, the Individual Defendants were approving the repurchase of Ebix shares on the open market, wasting millions of dollars of the Company's funds on artificially inflated stock.

11.   Furthermore, on November 5, 2012, reports surfaced that Ebix was under investigation by the U.S. Securities & Exchange Commission ("SEC") relating to its "revenue recognition, internal controls and the accuracy of the company's public statements to shareholders."   Defendant Raina denied the existence of an investigation, stating: "[y]ou could not be more off the mark— that is a complete lie and at least not known to us in any manner whatsoever."   In addition, in its Annual Report on Form 10-K, dated March 18, 2013, that was signed by all the Company's directors, no mention was made of the pending SEC investigation. Defendants continued to conceal the existence of the investigation until the Company filed its' most recent Form 10-Q, which finally admitted that not only was a **formal** SEC investigation ongoing, but that Ebix had received the first subpoena in connection with the investigation on December 3, 2012 and a second subpoena on April 16, 2013. Moreover, *Bloomberg* previously reported that Ebix is also the subject of an Internal Revenue Services ("IRS")

investigation.  Ebix has only recently confirmed that the IRS has open audits for tax years 2008-2010.

12.  Even in the face of mounting litigation and increased exposure to massive costs and potential liability, the Individual Defendants have done nothing to remedy the Company's poor internal controls.  On May 16, 2013 Microsoft filed suit against Ebix (the "Microsoft Litigation") alleging that the Company has reproduced software without authorization under a 2010 licensing agreement.  The suit further alleges that Ebix refuses to conduct an internal audit or agree to an independent audit to determine the amount of money it owes Microsoft.

13.  On May 1, 2013 Ebix announced that it had entered into a definitive Merger Agreement to be acquired by the Goldman Affiliates in a cash-for-stock deal that values the Company at $820 million.   The motivation behind this merger is obvious—the Individual Defendants are seeking to rid themselves of exposure to millions of dollars in personal liability in connection with this derivative action, while at the same time reaping massive financial benefits for themselves.

14.  Under the terms of the merger, shareholders will receive $20.00 per share.  Ebix claims this price is an 18% premium, but this number is skewed, as it

averages the Company's trading price over the last thirty days and takes advantage of lower than normal trading prices at the beginning of April 2013. The price represents only a 7.5% premium when compared to Ebix's closing price on April 30, 2013—the day before the merger.  This price is unfair because it severely undervalues the Company and fails to take into account the valuable pending derivative claims.

15.  The defendants named in this derivative and class action, comprising the Company's entire current Board of Directors ("Board") and its two most senior officers, had the responsibility to ensure that there existed at Ebix sufficient internal controls to maintain the accuracy of its reported financial results and to ensure that the Company's disclosures to shareholders and the market were truthful and accurate.  The defendants utterly failed to do so, instead presiding over a multiyear disclosure and financial reporting fraud that has had disastrous consequences for Ebix and its shareholders.  After destroying the Company's reputation and goodwill, allowing it to become the subject of serious regulatory proceedings, and in the face of enormous personal liability, the Individual Defendants had little choice but to sell Ebix.  In connection with this sale, the Individual Defendants had a fiduciary duty to place the interests of Ebix's shareholders before their own.  The Individual Defendants completely

disregarded this duty, instead orchestrating a sale of the Company at an unfairly low price that was designed not only to shield them from personal liability, but to net them significant financial benefits.

16.  Accordingly, Plaintiff brings this action derivatively to recover damages to the Company caused by defendants' breaches of their fiduciary duties. The Individual Defendants breached their fiduciary duties by:

- causing or allowing the Company to disseminate to Ebix shareholders materially inaccurate information through, *inter alia*, SEC filings and other public statements and disclosure;

- concealing and denying the existence of a formal SEC investigation despite the fact that it had received two subpoenas in connection with that investigation;

- causing the Company to repurchase more than 1.9 million shares of Ebix stock at a time when the price was artificially inflated by the Company's false statements;

- failing to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP; and

- willfully ignoring the obvious and pervasive problems with Ebix's internal controls and failing to make a good faith effort to correct the problems; and

- with regards to Individual Defendants Eckert, Bhalla, Herter, Benz, and Keller, disposing of shares of Ebix common stock while in possession of material inside information regarding an ongoing SEC investigation of the Company, which the Company initially denied and continued to deny until it filed its first quarter 2013 10-Q on May 10, 2013.

17.  Because defendants face a substantial likelihood of liability for their misconduct, any demand on the Board to bring the above-asserted claims would be futile, and is therefore excused.  The directors further lack independence from defendant Raina, who dominates the Company and the Board, and therefore would never vote to pursue the claims asserted herein.

18.  Plaintiff also brings this action on behalf of a class of Ebix shareholders to recover damages caused by the Individual Defendants' breaches of fiduciary duty in connection with the sale of Ebix to the Goldman Affiliates at an unfair price.  The Individual Defendants breached their fiduciary duties of due care, good faith, and loyalty by favoring their own interests over those of the

Ebix shareholders in the sale of the Company.  Plaintiff seeks to enjoin the sale of Ebix to the Goldman Affiliates under the terms negotiated by the Individual Defendants to avoid liability for their wrongdoing in this derivative action.

## III.   JURISDICTION AND VENUE

19.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise in part under Section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (2) as the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff and Defendants are citizens of different states. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.   This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, is a citizen of Georgia, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

21.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  The violations of law complained of herein occurred in part in the District.

Furthermore, Ebix's principal executive offices are located at 5 Concourse Parkway, Suite 3200, Atlanta, Georgia.

## IV.   **THE PARTIES**

22.   Plaintiff Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund is a current holder of Ebix shares, and was an Ebix shareholder at the time of the misconduct alleged herein.  Plaintiff is a citizen of New York.

23.   Nominal Defendant Ebix is a Delaware corporation, headquartered at 5 Concourse Parkway, Suite 3200, Atlanta, Georgia.   Ebix is a supplier of software and e-commerce solutions to the insurance industry, providing it with carrier systems, agency systems and exchanges.  The Company also purports to develop custom software for the insurance and financial industries.   The Company is publicly traded on Nasdaq Global Select System under the symbol EBIX.

24.   Defendant Raina was at all relevant times the CEO and Chairman of the Board of Ebix.  Raina joined Ebix in October, 1997, becoming President and CEO as of August 2, 1999 and September 23, 1999, respectively.  He became Chairman in May, 2002.   Raina purportedly holds an industrial engineering degree from Thapar University in Punjab, India.  In fiscal year 2009, Raina was

paid $2,467,996 in total cash and stock compensation.  In fiscal year 2010, Raina was paid $2,967,575 in total cash and stock compensation.  In fiscal year 2011, Raina was paid $3,430,154 in total cash and stock compensation.  In fiscal year 2012, Raina was paid $3,516,896 in total cash and stock compensation. According to the Company's Proxy Statement dated October 9, 2012, Raina owns over 3.6 million shares of Ebix stock, or approximately 9.3% of the Company's outstanding shares. On September 20, 2012 this Court upheld allegations that Raina had defrauded purchasers of Ebix stock during fiscal years 2009, 2010 and 2011.  As a result of the sale of the Company, Raina will receive tens of millions of dollars from a change-in-control bonus, significantly increase his ownership in the Company, and will remain CEO.  On information and belief, Raina is a citizen of Georgia.

25.  Defendant Kerris was at all relevant times the CFO of Ebix.  Kerris joined Ebix as CFO and Corporate Secretary on October 22, 2007.  Kerris is a certified public accountant, holding an accounting and economics degree from North Carolina State University.  In fiscal year 2009, Kerris was paid $183,025 in total cash and stock compensation.  In fiscal year 2010, Kerris was paid $280,242 in total cash and stock compensation.  In fiscal year 2011, Kerris was paid $266,164 in total cash and stock compensation.  In fiscal year 2012, Kerris was

paid $269,165 in total cash and stock compensation. Kerris owns 1,036 shares of restricted Ebix stock. On September 20, 2012 This Court upheld allegations that Kerris had defrauded purchasers of Ebix stock during fiscal years 2009, 2010 and 2011. On information and belief, Kerris is a citizen of Georgia.

26. Defendant Neil Eckert ("Eckert") has been a director of Ebix and the Chairman of the Corporate Governance and Nominating Committee of the Board (the "Governance Committee") since 2005. In fiscal year 2011, Eckert received $135,533 for his services as a director. In fiscal year 2012, Eckert received $135,728 for his services as a director. According to the Company's Annual Proxy Statement filed on Form DEF14A on October 9, 2012 (the "2012 Proxy"), Eckert owns 126,876 shares of Ebix stock, which includes options to purchase 102,376 shares of common stock. Eckert will receive approximately $2,047,520 in cash-out payments as a result of the sale of Ebix. On information and belief, Eckert is a citizen of the United Kingdom.

27. Defendant Rolf Herter ("Herter") has been a director of Ebix and a member of the Corporate Governance Committee since 2005. In fiscal year 2011, Herter received $135,533 for his services as a director. In fiscal year 2012, Herter received $135,728 for his services as a director. According to the Company's 2012 Proxy, Herter owns 102,376 shares of Ebix stock, which

includes options to purchase 75,376 shares of common stock.  Herter will receive approximately $1,507,520 in cash-out payments as a result of the sale of Ebix. Herter is also a Director of the Rennes Foundation.  The Rennes Foundation owns 3,562,593 shares of Ebix common stock equal to 9.4% of Ebix outstanding shares.  Concurrent with execution of the Merger Agreement, the Rennes Foundation, together with Defendant Raina, entered into a Rollover Letter Agreement under which the Rennes Foundation will exchange a substantial, but unspecified, portion of Ebix common stock in exchange for a 15% ownership interest in the Company. On information and belief, Herter is a citizen of Switzerland.

28.   Defendant Hans Ueli Keller ("Keller") has been a director of Ebix and a member of the Audit Committee of the Board (the "Audit Committee") since 2004.  In fiscal year 2011, Keller received $145,533 for his services as a director. In fiscal year 2012, Keller received $145,728 for his services as a director. According to the Company's 2012 Proxy, Keller is the beneficial owner of 56,854 options to purchase shares of Ebix stock.   Keller will receive approximately $1,137,080 in cash-out payments as a result of the sale of Ebix. On information and belief, Keller is a citizen of Switzerland.

29.  Defendant Pavan Bhalla ("Bhalla") has been a director of Ebix and Chairman of the Audit Committee since 2004.  For fiscal year 2011, Bhalla received $145,533 for his services as a director.  For fiscal year 2012, Bhalla received $145,728 for his services as a director.  According to the Company's 2012 Proxy, Bhalla is the beneficial owner of 132,751 options to purchase shares of Ebix stock.  Bhalla will receive approximately $2,655,020 in cash-out payments as a result of the sale of Ebix.  On information and belief, Bhalla is a citizen of India.

30.  Defendant Hanz Benz ("Benz") has been a director of Ebix and a member of the Audit Committee since 2005.  For fiscal year 2011, Benz received $140,783 for his services as a director.  For fiscal year 2012, Benz received $140,728 for his services as a director.  According to the Company's 2012 Proxy, Benz owns 56,156 shares of Ebix stock, which includes options to purchase 55,156 shares of Ebix stock. Benz will receive approximately $1,103,120 in cash-out payments as a result of the sale of Ebix.  On information and belief, Benz is a citizen of Switzerland.

31.  According to Form 4s filed with the SEC on or about March 8, 2013, Defendants Herter, Bhalla, Keller, Benz and Eckert executed stock options on February 8, 2013 at between $6.98 and $7.17 per share allowing each to acquire

additional shares in the Company in a series of net-settled stock option exercises as follows:

| Defendant | No. of Options Exercised | Price of Options | No. of Shares Disposed | Price of Shares Disposed | Net Increase in Ownership Post-Transactions | Net Increase in Ownership Value |
|---|---|---|---|---|---|---|
| Herter | 27,000 | $6.98 | 11,259 | 16.74 | 15,741 | $153,632 |
| Bhalla | 3,039 | $7.17 | 1,320 | 16.74 | 1,719 | $16,450 |
| Keller | 8,478 | $6.98 | 3,535 | $16.74 | 4,943 | $48,243 |
| Benz | 13,527 | $6.98 | 5,640 | $16.74 | 7,887 | $76,977 |
| Eckert | 27,000 | $6.98 | 11,259 | $16.74 | 15,741 | $153,632 |

32. Plaintiffs allege herein that Defendants executed or caused these transactions to be executed while in possession of material non-public information relating to the SEC's investigation of Ebix, which was not disclosed until the 2013 Form 10-Q was filed on May 10, 2013, after the Merger had been announced.

33. The Defendants identified in paragraphs 24-30 are sometimes collectively referred to herein as the Individual Defendants. The Defendants identified in paragraphs 28-30 are sometimes collectively referred to herein as the

Audit Committee Defendants.  All of the Individual Defendants except Kerris are sometimes collectively referred to herein as the Director Defendants.

## V.   FIDUCIARY DUTIES AND OBLIGATIONS OF THE INDIVIDUAL DEFENDANTS

### a.  Duties of All Individual Defendants

34.  Each of the Individual Defendants, by virtue of his management and/or directorship positions, owed to the Company and its shareholders the fiduciary duties of care, loyalty, and good faith.

35.  As fiduciaries, the Individual Defendants were required to exercise good faith and prudent supervision over the management, policies, practices, and controls of the financial affairs of Ebix, including assuring the dissemination of truthful and reliable information concerning the business, operations, and financial performance of Ebix.

36.  To discharge their duties as fiduciaries, the officers and directors of Ebix were required to, among other things: (a) manage, conduct, supervise, and direct the business affairs of Ebix in accordance with the applicable federal, state and local laws, rules and regulations, and Ebix's charter and bylaws; (b) neither violate nor permit any officer, director or employee of Ebix to violate applicable federal laws, rules, and regulations and state or local laws; (c) implement and

maintain an adequate and functioning system of internal controls, such that Ebix's financial statements and other publicly disclosed information would be truthful and accurate.

### B.    Audit Committee Allegations

37.    The Audit Committee Defendants served on the Audit Committee during fiscal years 2009, 2010, 2011 and 2012.  The Audit Committee Defendants had enumerated duties with respect to the Company's financial reporting mechanisms and its internal control environment.  Because of these duties, the Audit Committee Defendants have a special relationship with the Company.

38.    The purpose, duties, and responsibilities of the Audit Committee are enumerated in the Audit Committee Charter (the "Charter"), which was appended to the Company's most recent Proxy Statement filed on October 9, 2012.  The Charter states that the Audit Committee "plays a critical role in serving as a check and balance for the Company's financial reporting system."   The Audit Committee's primary purpose is to "oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements."  Additionally, the Audit Committee is to assist the Board in fulfilling its oversight functions with respect to matters involving accounting, auditing, financial reporting, and internal control functions of the Company.   The

Committee's goal is to "help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices."

39.     According to the Charter, the Audit Committee has four primary functions: (1) overseeing financial reporting, (2) evaluating independent audit processes, (3) reviewing internal controls established by management, and (4) other functions.   In connection with these functions, the Audit Committee is responsible for reviewing the Company's quarterly and annual financial statements with management and the Company's auditors, and then recommending to the Board, based on the review, whether the financial statements should be included in the Company's Annual Reports.  The Audit Committee is also directly responsible for the appointment, compensation, retention and oversight of the work of the Company's independent auditors.

40.     Furthermore, the Charter provides that the Audit Committee is responsible for oversight of the Company's risk management and control, including the steps management has taken to monitor and control the Company's exposure to significant risk.   The Audit Committee must also "[r]eview with Auditors and Company's management their findings on the adequacy and effectiveness of internal controls."  Finally, the Audit Committee is responsible for

reviewing and monitoring compliance with the Company's Code of Ethics for Senior Financial Officers.

### C. Code of Ethics Allegations

41.     Raina and Kerris were CEO and CFO, respectively, at all relevant times.  By virtue of these positions, they were governed by the Code of Ethics for Senior Financial Officials.  The following provisions are applicable to Raina and Kerris.

42.     **Honest and Ethical Conduct:** Senior Financial Officers must exhibit and promote honest and ethical conduct by:

- Encouraging and rewarding professional integrity and eliminating barriers to responsible behavior; Promoting the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Respecting the confidentiality of information acquired in the course of work, except when authorized or otherwise legally obligated to disclose such information; and,

- Periodically communicating these ethical standards throughout the organization.

43.   **Financial Records and Periodic Reports:** Senior Financial Officers must establish and manage the enterprise transaction and reporting systems and procedures to provide that:

- Business transactions are properly authorized and accurately and timely recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles (GAAP) and policies established by the Company;

- False or artificial statements are not made in the Company's books and records, financial statements and related communications;

- The retention or disposal of Company records is in accordance with applicable legal and regulatory requirements and any records retention policies established by the Company; and

- Reports and documents filed by the Company with, or submitted by the Company to, the Securities and Exchange Commission, as well as other public communications made by the Company, include full, fair, accurate, timely and understandable disclosure.

44.    **Compliance with Applicable Laws, Rules and Regulations:** Senior Financial Officers must establish mechanisms to:

- Educate Company employees about applicable governmental laws, rules and regulations; and

- Monitor compliance with applicable governmental laws, rules and regulations.

45.    **Reporting of Non-Compliance:** Senior Financial Officers must promptly bring to the attention to the Audit Committee of the Company's Board:

- Material information that calls into question disclosures made by the Company in its filings with, or submissions to, the Securities and Exchange Commission or in other public communications;

- Information concerning significant deficiencies or material weaknesses in the design or operation of the Company's "internal control over financial reporting" or other factors that could adversely affect the Company's ability to record, process, summarize and report financial data;

- Information regarding any fraud, whether or not material, that involves management or other employees who have a

significant role in the Company's financial reporting, disclosures or internal control over financial reporting; Information concerning a violation of this Code or any other Company conduct codes, including any actual or apparent conflicts of interest between personal and professional relationships, involving management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting; and

- • Evidence of a material violation by the Company or its employees or agents of applicable governmental laws, rules or regulations.

## D. **Additional Duties of the Individual Defendants Under Ebix's Code of Conduct**

46.    Ebix maintains a Code of Conduct which applies to all employees, officers, and directors.

47.    The Code of Conduct conferred specific duties on defendant Kerris, who was designated as the Corporate Compliance Officer.  Under the Code, Kerris had the "ultimate responsibility for overseeing compliance with applicable laws, this Code of Conduct, and all related Ebix policies and procedures."  Kerris was

also required to "oversee internal monitoring and self-evaluation programs relating to Ebix's legal and regulatory obligations."

48.     Additionally, the Code required that all Individual Defendants "perform their responsibilities with a view toward causing Ebix's public communications and other reports f[i]led by Ebix with the Securities and Exchange Commission to be made on a timely basis and to contain disclosure that is full, fair, accurate and understandable."

## VI.     THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES
### A.     Company Background.

49.     Ebix supplies software products and services to the insurance industry.  According to Ebix, "our goal is to be the leading powerhouse of backend insurance transactions in the world.  The Company's technology vision is to focus on convergence of all insurance channels, processes and entities in a manner such that data can seamlessly flow once a data entry has been made."  To achieve this goal, Ebix purports to "work collaboratively with clients to develop innovative technology strategies and solutions that address specific business challenges."

50.     In recent years, Ebix has been heavily focused on the acquisition and integration of smaller players in the insurance software market as a vehicle for growth, earning Ebix the moniker of being a "rollup." According to the Company's

most recent Form 10-K, filed on March 18, 2013, from 2009 through 2012 alone, Ebix acquired sixteen different software companies across the world.

51.    The Company's acquisition spree has coincided with a substantial increase in reported revenues and net income in recent years.  By way of example, for fiscal year 2003, the Company reported revenues of $14.4 million and net income of $1.6 million, or $.71 per diluted share.  By fiscal year 2012, revenues had soared to a whopping $199.4 million, about fourteen times over, with net income increasing to $70.6 million, or $1.80 per diluted share.

### B.    Ebix Hid Its Internal Control Problems

52.    Among the glaring issues raised by the Copperfield report was Ebix's history of auditor turnover and abnormally low audit fees for a firm its size.

53.    As Copperfield reported, in 2004, KPMG, Ebix's auditor at the time, informed Ebix that it had identified "reportable conditions" with respect to the Company's internal controls.  Ebix's 2004 Form 10-K described the problems as "(1) delegation of authority . . . and inadequate reviews by persons other than the preparer of accounting information; (2) the lack of a formalized contract review process to ensure proper revenue recognition; (3) the lack of a complete understanding of the Company's income tax positions and related accounts; (4) inadequate documentation for certain unusual transactions (including the basis for

the Company's accounting conclusions), and (5) internal control matters (documented testable control environment) under the Sarbanes–Oxley Act."

54.    In 2004, BDO Seidman LLP ("BDO"), Ebix's auditor after KPMG resigned earlier, that year, also "identified certain significant deficiencies relating to the Company's internal control over financial reporting."  BDO's observations related to "the lack of knowledge and leadership at foreign locations, inadequate documentation for certain accounting transactions, insufficient analysis and review of domestic account reconciliations, lack of documentation of development costs and related agreements, and the lack of documentation to support the Company's income tax provisions and related accounts."

55.    BDO remained as Ebix's auditor in 2005 and 2006, but Ebix avoided addressing the internal control issues as it did not engage BDO to perform an audit of the Company's internal controls, as this was not required under applicable regulatory authority.  In April 2007, Ebix disclosed that BDO had been dismissed as the Company's auditor and that the Company had hired Miller Ray Houser & Stewart ("Miller"), a smaller accounting firm.  Miller then merged with Habif, Arogeti & Wynne, LLP ("Habif"), a regional auditing firm.  In 2008, after Habif declined to continue working with Ebix, the Company hired yet another small-firm auditor, Cherry, Bekaert & Holland, LLP ("CBH").

56.     In 2008, 2009, and 2010, CBH audited Ebix's internal controls and concluded each year that Ebix "maintained, in all material respects, effective internal control over financial reporting."  However, as reported by Copperfield, CBH's audits were suspect.  Notwithstanding the far-flung nature of the Company's business, the entirety of Ebix's audit fees paid to CBH for fiscal year 2009 was just $343,000.  Most significantly, even with the dramatic growth in the Company's operations, total audit fees for 2009 had increased by only about $50,000 since KPMG's 2003 audit, back when the Company was a tiny fraction of its current size.  Copperfield further pointed out that comparable software companies paid multimillion dollar annual fees to their auditors.

57.     Copperfield's March 24, 2011 analysis of the auditor turnover problem was prescient, as just two months later, on May 24, 2011, the Peak shareholders filed their lawsuit against Ebix.  The Peak shareholders alleged that Ebix had not paid them an "earn-out" incentive payment they were entitled to, based on Peak's post-acquisition performance.  Ebix's obligation to make "earn-out" payments was a common feature in connection with its acquisitions.

58.     According to the Peak complaint, Ebix's accounting systems were "plagued with errors" and Ebix was "consistently unable to properly bill customers, tie customers to invoices issued by Ebix on behalf of Peak, provide

basic financial data, or calculate Peak's revenue" during the earn-out period. According to the Peak complaint, "Ebix does not have sufficient internal accounting controls to allow their books and records to be relied on."

59.    The Peak plaintiffs further alleged that Ebix had padded quarterly earnings by overstating accounts receivable.  In a June 30, 2011 news story describing the Peak lawsuit, *Bloomberg* noted that a similar suit was filed in San Diego, California in April, 2010, alleging that Ebix had lost control of accounting for its receivables.  Furthermore, as alleged below, the Company's faulty internal control environment permitted other accounting and disclosure manipulations to occur.

60.    A July 16, 2011 *Barron's* article also addressed the issue of Ebix's internal controls and the Company's high auditor turnover, commenting that "as Ebix has gotten larger, its audit firms have gotten smaller.  The Company's globe-spanning financial activities have been audited for the last four years by Cherry, Bekaert & Holland."  According to the article, "the SEC's Edgar database shows [CBH] has worked on the employee-benefit plans of a few big companies, but its corporate-audit clients are mostly penny stocks and micro-cap companies."

61.    Despite these red flags, the Individual Defendants have failed to take any steps whatsoever to remedy the Company's internal control problems, leading

to continued potential liability with vendors and licensors.  On May 16, 2013 Microsoft filed suit against Ebix alleging that the Company has reproduced software without authorization under a 2010 licensing agreement.  The suit further alleges that Ebix refuses to conduct an internal audit or agree to an independent audit to determine the amount of money it owes Microsoft.  The lawsuit alleges that these problems were first raised with Ebix in January 2012 and that Ebix has refused to submit license orders monthly, refused to keep records of products it used, and refused to verify its licensing compliance.

## C.   Ebix's Improper Tax Scheme Inflated Earnings.

62.   Copperfield further noted that Ebix was engaged in a manipulative foreign tax scheme to avoid tax liability and increase earnings.  Ebix maintains a substantial presence in India and Singapore, where a majority of its employees are located.  Ebix claimed in its 2009 and 2010 Forms 10-K and in public statements that its India and Singapore subsidiaries enjoyed a tax holiday through 2015, permitting the Company to pay shockingly low tax rates of 2.5% and 1.1%, in 2009 and 2010 respectively.

63.   According to Copperfield, Ebix's operating units were buying services and software from Ebix's foreign subsidiaries, shifting the Company's earnings (of which 75% were derived in the United States) to countries with low

tax rates.  Generally Accepted Accounting Principles ("GAAP") required Ebix to record a deferred tax liability and increase its tax expenses relating to intercompany transactions if it did not permanently re-invest the foreign earnings locally.  Ebix could not possibly have been permanently reinvesting locally, because the money due from Ebix's U.S. operating units was never transferred to India or Singapore.

64.    Indeed, a July 16, 2011 *Barron's* article entitled "Prolonging a Foreign Tax Holiday" discussed Ebix's 2010 public filings in India, stating that "at one point in 2010 . . . receivables due from the U.S. parent ballooned to almost three years' worth of one Indian subsidiary's sales."  Furthermore, the Indian regulatory filings "show several years in which receivables from Ebix U.S. swelled beyond a year's sales" for the Indian subsidiaries.

65.    The July 16, 2011 *Barron's* article further reported:

> Another interesting thing about Ebix's subsidiaries in India is that there are two of them.  Through 2008, the U.S. company's rising stream of payments to India went to a unit called Ebix Software India Private Ltd., which enjoyed a tax-free holiday as a new software-export business.  As the holiday was approaching its end, Ebix incorporated a second Indian unit, Ebix Software Asia SEZ Private Ltd.  Payments to the first subsidiary plunged -- by 43% in 2009, then another 68% in 2010 -- while payments tripled to the new unit, whose tax holiday will run to 2015.

We asked Raina the business purpose of this switch.  He said the newer corporation was in a location with room to grow and centralize India operations.  Auditing the large portion of Ebix financials that flow through India is a small Delhi firm called Baweja & Kaul.  The Public Company Accounting Oversight Board (PCAOB), a U.S. accounting regulator, has inspected many audit firms in India; B&K isn't one of them.

\*   \*   \*

According to the detailed financial records available in India, B&K's audit of Ebix's $38 million Indian business last year only set the company back about $9,000 -- much less than the two units spent on holiday gifts for the Diwali "festival of lights."  Barron's asked Raina how U.S. auditor Cherry, Bekaert & Holland supervises the Indian audit.  In the past year, the accounting regulators at the PCAOB have expressed great concern about the ability of small U.S.-based auditors to properly audit businesses in distant parts of the world (the PCAOB identified no specific firms in its warning).  "All auditors test the work of overseas auditors," he reassured us by e-mail.

66.     Ebix's tax ruse, as exposed by Copperfield and discussed in the *Barron's* article, permitted Ebix to materially overstate its earnings per share by suppressing the Company's tax rates.  For fiscal year 2009, Ebix was able to reduce its tax expense by $5.5 million, improving its diluted earnings per share by $0.14.  For fiscal year 2010, Ebix was able to reduce its tax expense by $11.5 million, improving its diluted earnings by $0.29 per share.

67.     The Company's most recent 10-Q now indicates that Ebix has an "open federal income tax audit for taxable years 2008 through 2010."  Despite the

public reports of Ebix's tax avoidance scheme and an IRS inquiry, Defendants concealed the existence of these audits until this Form 10-Q was issued on May 10, 2013.

**D.    Ebix Hid Its Slumping Organic Growth Rate.**

68.    Until 2009, Ebix provided financial information that allowed investors to distinguish between revenue achieved through legacy operations and revenue achieved through acquisition.  Beginning in the first quarter of 2009, however, Ebix omitted information distinguishing between legacy and acquired revenue sources.  The Company excised this information because the Individual Defendants knew that organic growth rates were actually declining and because organic growth numbers are particularly important to investors in "rollup" companies.

69.    According to the Copperfield Report, shareholders had a distorted view of the Company's organic growth profile, as real organic growth appeared to be relatively minimal.  The Report detailed that, "estimating the contributions of acquired businesses leads to the conclusion that Ebix has no growth."  In this regard, the Report noted that Ebix spent only $6.4 million on sales and marketing in 2010, less than 5% of the Company's revenue.  And the Company spent only $13.6 million on product development, which is consistent with a mature industrial company, not a growing technology company.

70.    The July 16, 2011 *Barron's* article commented on the obscure disclosure surrounding Ebix's reported revenue growth:

> Raina has created shareholder value through a train of acquisitions that brought aboard software revenue and tens of millions in net-operating-loss carryforwards to reduce taxes. The acquired products became profitable when Ebix relocated software support and development to its workers in Singapore and India, where almost two-thirds of Ebix employees now reside.  As a result, Ebix's operating-profit margins are 40%.  Revenues grew 35% in 2010 to more than $130 million, producing net income of $59 million, or $1.51 a share.  Per share earnings rose 16% in the March 2011 quarter . . . . In the blur of 18 acquisitions, it's been hard to distinguish acquired growth from organic growth.

**E.    The Individual Defendants Disseminated False Statements To Shareholders.**

71.    The true state of affairs at Ebix confirms that the Individual Defendants misled shareholders for, at the very least, the reporting periods of fiscal years 2009, 2010, and 2011 and continues to mislead them.  The Individual Defendants made materially misleading statements regarding the adequacy of Company's internal controls and the accuracy of the Company's financial statements in the SEC filings each of which they approved as described below, and in related analyst conference calls and press releases regarding the subject financial results thereby violating their fiduciary duties of disclosure and candor.

(a)   <u>Q1 2009 Form 10-Q, filed May 8, 2009</u>.  This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $20.67 million, net income of $8.34 million, and diluted earnings per share of $0.69.  The Company reiterated these financial results in a press release issued on May 6, 2009 and in a presentation on an earnings conference call that same day.  The Form 10-Q stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management.  These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

(b)   <u>Q2 2009 Form 10-Q, filed August 7, 2009</u>.  This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $22.42 million, net income of $8.96 million, and diluted earnings per share of $0.73.  The Company reiterated these financial results in a press release issued on August 5, 2009, and in a presentation on an earnings conference call that same day.  The Form 10-Q stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to

senior management.   These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

(c)    Q3 2009 Form 10-Q, filed November 9, 2009. This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $23.29 million, net income of $9.43 million, and diluted earnings per share of $0.76.   The Company reiterated these financial results in a press release issued on November 4, 2009, and in a presentation on an earnings conference call that same day.   The Form 10-Q stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management.   These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

(d)    Fiscal Year 2009 Form 10-K, filed March 16, 2010. This Form 10-K, signed by all of the Individual Defendants, reported (a) fourth quarter 2009 revenues of $31.3 million, net income of $12.1 million, and diluted earnings per share of $.92; and (b) fiscal year 2009 revenues of $97.7 million, net income of $38.8 million, and diluted earnings per share of $3.10.   The Company reiterated

these financial results in a press release issued on March 8, 2010, and during a presentation on an earnings conference call that same day. The Form 10-K stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management. The Form 10-K further included a representation letter from CBH, the Company's auditor, that the financial statements were truthful, and that the Company's internal controls were effective. These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

(e)     Q1 2010 Form 10-Q, filed May 10, 2010. This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $31.6 million, net income of $12.4 million, and diluted earnings per share of $0.32. The Company reiterated these financial results in a press release issued on May 7, 2010 and during a presentation on an earnings conference call that same day. The Form 10-Q stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management. These reported financial results and the statements

38

regarding the purported adequacy of the Company's internal controls were false.

(f)      Q2 2010 Form 10-Q, filed August 9, 2010.  This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $32.2 million, net income of $14 million, and diluted earnings per share of $0.36.  The Company reiterated these financial results in a press release issued August 9, 2010 and during a presentation on an earnings conference call that same day.  The Form 10-Q stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management.  These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

(g)      Q3 2010 Form 10-Q, filed November 9, 2010.  This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $33.3 million, net income of $16.7 million, and diluted earnings per share of $0.43.  The Company reiterated these financial results in a press release issued on November 9, 2010, and during a presentation on an earnings conference call that same day.  The Form 10-Q stated that the Company's CEO (Raina) and

CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management.  These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

(h)    Fiscal Year 2010 Form 10-K, filed March 16, 2011.  This Form 10-K, signed by all of the Individual Defendants, reported (a) fourth quarter 2010 revenues of $35.1 million, net income of $15.9 million, and diluted earnings per share of $0.42; and (b) fiscal year 2010 revenues of $132.2 million, net income of $59 million, and diluted earnings per share of $1.51.   The Company reiterated these results in a press release issued on March 14, 2011 and during a presentation on an earnings conference call the same day.  The Form 10-K stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management.  The Form 10-K further included a representation letter from CBH, the Company's auditor, that the financial statements were truthful, and that the Company's internal controls were effective.   These reported

financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

      (i)     Q1 2011 Form 10-Q, filed May 10, 2011. This Form 10-Q, signed by defendants Raina and Kerris, reported revenue of $40.1 million, net income of $15.2 million, and diluted earnings per share of $0.37.  The Company reiterated these financial results in a press release issued May 10, 2011 and during a presentation on an earnings conference call that same day.  The Form 10-Q stated that the Company's CEO (Raina) and CFO (Kerris) "have concluded that . . . our disclosure controls and procedures were effective" to provide reasonable assurance that material information was gathered and disclosed to senior management.  These reported financial results and the statements regarding the purported adequacy of the Company's internal controls were false.

72.    The Individual Defendants solicited shareholder approval of the reelection of the Director Defendants, ratification of CBH as Ebix's registered accounting firm, shareholder approval of the 2010 Ebix, Inc. Stock Incentive Plan, and advisory approval of the 2010 and 2011 compensation plan of Ebix's named executive officers, pursuant to proxy statements containing false and misleading statements. The shareholders approved these proposals based on materially false and

misleading statements within the Proxy itself, and the materially false and misleading financial statements described above, permitting the Individual Defendants to receive lucrative stock option awards.  The false and misleading Proxy statements are described below.

(a)     Form DEF14A, filed October 8, 2010.  The October 8, 2010 Proxy Statement solicited shareholder approval of the reelection of the Director Defendants, ratification of CBH as Ebix's registered accounting firm, and shareholder approval of the 2010 Ebix, Inc. Stock Incentive Plan.  The Proxy stated that the Company had in place a Code of Ethics for Senior Financial Officers and a separate Code of Conduct that was applicable to all Ebix directors, officers, and employees.  The Proxy further represented that the "current Board leadership structure is appropriate and helps ensure proper risk oversight for Ebix."   Finally, the Proxy included a report of the Audit Committee stating that it had reviewed the Company's audited financial statements for the year ended December 31, 2009 with management and CBH, and recommended that the statements be included in the 2009 Form 10-K.  The Proxy refers shareholders to the 2009 Form 10-K for additional information.  These statements regarding corporate governance, risk management, and the

purported accuracy of Ebix's financial statements were materially false and misleading.

(b)   Form DEF14A, filed October 21, 2011.  The October 21, 2011 Proxy Statement solicited shareholder approval of the reelection of the Director Defendants, ratification of CBH as Ebix's registered accounting firm, an advisory vote on the 2010 compensation plan (the period in which the material misstatements and omissions had occurred) of the Company's named executive officers, and an advisory vote on the frequency with which an advisory vote on compensation for named executive officers should be submitted to stockholders.  The Proxy stated that the Company had in place a Code of Ethics for Senior Financial Officers and a separate Code of Conduct that was applicable to all Ebix directors, officers, and employees.  The Proxy further represented that the "current Board leadership structure is appropriate and helps ensure proper risk oversight for Ebix."  Finally, the Proxy included a report of the Audit Committee stating that it had reviewed the Company's audited financial statements for the year ended December 31, 2010 with management and CBH, and recommended that the statements be included in the 2010 Form 10-K.  The Proxy refers shareholders to the 2010 Form 10-K for additional information.   These   statements   regarding   corporate   governance,   risk

management, and the purported accuracy of Ebix's financial statements were materially false and misleading.

(c)     Form DEF14A, filed October 9, 2012.  The October 9, 2012 Proxy Statement solicited shareholder approval of the reelection of the Director Defendants, ratification of CBH as Ebix's registered accounting firm, and an advisory vote on the 2011 compensation plan (the period in which the material misstatements and omissions had occurred) of the Company's named executive officers.  The Proxy stated that the Company had in place a Code of Ethics for Senior Financial Officers and a separate Code of Conduct that was applicable to all Ebix directors, officers, and employees.  The Proxy further represented that the "current Board leadership structure is appropriate and helps ensure proper risk oversight for Ebix."  Finally, the Proxy included a report of the Audit Committee stating that it had reviewed the Company's audited financial statements for the year ended December 31, 2011 with management and CBH, and recommended that the statements be included in the 2011 Form 10-K.  The Proxy refers shareholders to the 2011 Form 10-K for additional information. These statements regarding corporate governance, risk management, and the purported accuracy of Ebix's financial statements were materially false and misleading.

## VII.   THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY EXPOSE THEM TO A SUBSTANTIAL LIKELIHOOD OF LIABILITY IN THE CLASS ACTION

73.   The precipitous decline in the price of Ebix's stock caused by revelations of the issuance of materially false and misleading statements to investors has resulted in the filing of the Class Action.  That litigation alleges claims against Ebix, and Individual Defendants Raina and Kerris, for violations of the Securities Exchange Act of 1934, § 10(b), Rule 10b-5 promulgated thereunder, and §20(a).

74.   As alleged herein, by order dated September 20, 2012, this Court upheld the Class Action plaintiffs' allegations against a motion to dismiss, holding that the plaintiffs had satisfied the rigorous pleading standards for securities fraud imposed by the PSLRA.

75.   Analyzing allegations regarding (a) the Company's undisclosed internal control problems, (b) its foreign tax holiday scheme and (c) its obscuring of organic growth data, among other allegations, this Court held that the plaintiffs had "pled misrepresentations and omissions of material fact with sufficient particularity to satisfy the PSLRA's standards."

76. This Court upheld these allegations of falsity with respect to each of the SEC filings alleged in paragraph 71 (a)-(i) herein, in addition to related press releases and public statements.

77. This Court further upheld allegations that the defendants, including Raina and Kerris, had acted with scienter, or conduct that was "at least severely reckless."

## VIII.   THE COMPANY HAS BEEN DAMAGED

78. The Individual Defendants' dissemination of misleading financial statements and disinformation in response to investor criticism has damaged the Company.  The Company has been exposed to substantial expense (and potential liability) arising out of the Peak Litigation, the Microsoft Litigation, and the Class Action due, in part, to repeated failures by the Individual Defendants to address serious internal financial control issues.   In regards to the Class Action, the Company's most recent 10-K, filed on March 18, 2013, acknowledged that "any securities litigation would involve substantial costs."

79. The Company is also likely to incur substantial expense in connection with the ongoing SEC investigation, including the costs associated with investigating and responding to regulatory inquiries or enforcement actions, in addition to any fines or penalties imposed.

80.    Furthermore, *Bloomberg* has reported that the Company is the subject of an IRS investigation, raising the specter of even more regulatory costs. Ebix has yet to confirm the IRS investigation, but the Company's most recent 10-Q indicates that Ebix has an "open federal income tax audit for taxable years 2008 through 2010." Despite the public reports of Ebix's tax avoidance scheme and an IRS inquiry, Defendants concealed the existence of these audits until this Form 10-Q was issued on May 10, 2013.

81.    Furthermore, the Individual Defendants have caused the Company to waste millions of dollars by repurchasing shares at artificially inflated prices. According to the Company's Form 10-K for fiscal year 2010, between January and August 2010, the Individual Defendants caused the Company to repurchase 669,978 shares of Ebix stock at artificially inflated prices for $10.7 million. According to the Company's Form 10-K for fiscal year 2011, between January and June 2011, the Individual Defendants caused the Company to repurchase approximately 1.3 million shares of Ebix stock at artificially inflated prices for more than $26.1 million.

82.    In addition, the matters raised herein have caused substantial damage to the Company's reputation. This is evidenced in part by the dramatic decline in the Company's share price following revelations that the Company's financial

statements contained material errors, and that the Company's internal controls were deficient.  Indeed, following the March 24, 2011 Copperfield report and the June 30, 2011 report on the Peak litigation, over $350 million in shareholder value was wiped out by declines in the market price of Ebix stock.

83.     Moreover, Ebix stock plunged 27% in February 2013 after reports surfaced that the Company failed to disclose a $65.8 million related-party loan to its Singapore subsidiary.  According to a February 21, 2013, *Bloomberg* article entitled "*Ebix Drops After Report on Singapore Related Party Loan*" the amount of the related-party loan "exceeds Ebix's net income for 2009 and 2010, and falls just short of the $71.4 million in net income reported for 2011."  Ebix has not disclosed this transaction in any of its SEC filings.

84.     Market sentiment further reflects the Company's declining reputation caused by the Individual Defendants' repeated breaches of fiduciary duties.  In February 2013 it was reported that the short interest in the Company was 13.02 million shares—the highest since July 2011.

85.     Finally, as alleged above, Individual Defendants Herter, Bhalla, Keller, Benz, and Eckert misused corporate information for their own benefit when they improperly exercised stock options and disposed of shares while in possession of material inside information regarding the ongoing SEC investigation into the

Company, which the Company continued to deny until it filed its first quarter Form 10-Q on May 10, 2013.

### IX.   THE INDIVIDUAL DEFENDANTS AGREED TO SELL EBIX IN AN UNFAIR DEAL DESIGNED AND INTENDED TO ELIMINATE THEIR LIABILITY ON VALUABLE PENDING DERIVATIVE CLAIMS AT A PRICE THAT FAILS TO RECOGNIZE THE VALUE OF THESE CLAIMS

86.   The Individual Defendants' pervasive pattern of misconduct severely damaged the Company.  As a result, the Individual Defendants had no option but to structure a sale of the Company to the Goldman Affiliates.

87.   The sale is direct result of the Individual Defendants' misconduct and it is designed and intended to eliminate the Individual Defendants' personal liability in connection with this derivative claim, while also netting them substantial financial benefits.  Upon completion of the sale, Ebix will become a private company and its shares will no longer be listed on any public exchange. The sale is expected to close in the third quarter of 2013.

88.   The sale dramatically undervalues the Company.  Under the terms of the Merger Agreement, shareholders will receive only $20.00 per share.  Ebix alleges that this price is an 18% premium, but that number is skewed because it averages Ebix's trading price over the last thirty days and takes advantage of unusually low trading prices at the beginning of April 2013.  The $20.00 price

represents only a *7.5% premium* when compared to Ebix's closing price on April 30, 2013—the day before the announcement of the Merger Agreement.

89.  More important, the $20.00 price does not take into account the value of the pending derivative claims.   By terms of the Merger Agreement, no provision is made for the substantial derivative liability of the Ebix Board, and no reserves or other financial accounts are established to ensure that Ebix shareholders retain the ability to recoup the massive amounts Ebix has lost recently due to the Individual Defendants' breaches of fiduciary duties.   The value of the derivative claim is substantial, as it would include the millions of dollars Ebix spent on repurchasing its shares at artificially inflated prices, as well as damages related to the Company's expenses in the Class Action, the Peak lawsuit, and the regulatory investigations, and any damages caused to the Company by Individual Defendants Herter, Bhalla, Keller, Benz, and Eckert's having exercised stock options while in possession of material information regarding the pending SEC investigation against the Company.

90.  The Individual Defendants' motive for accepting the $20.00 per share price is obvious—the sale is an attempt to extinguish the significant personal liability of the Individual Defendants in this pending derivative action, where the

Individual Defendants themselves are charged with liability to Ebix for millions of dollars.

91.   Market criticism of the $20.00 per share price was swift.   For example, a May 1, 2013 *Motley Fool* article titled "Goldman Sachs Bids $20 a share for Ebix," explains that the proposed transaction is "more than 10% below Ebix's valuation a year ago" and "only about a 7.5% premium" over the price Ebix shares closed at the day before the merger.  Additionally, on the date the merger was announced, Ebix's shares "close[d] at $20.60—$0.60 more than Goldman has offered to pay."

92.   In a May 1, 2013 *Bloomberg* article titled "Ebix Jumps After Agreeing to Go Private with Goldman Sachs," Ivan Feinseth, the Chief Investment Officer at Tigress Financial Partners, stated that the "bid from Goldman Sachs is at least $6 too low" and that he was "a little surprised that Robin is selling at this price . . . .  If you really look at its value to a financial or strategic buyer, I think it's greater."

93.   A May 9, 2013 *SeekingAlpha* article titled "Ebix Shareholders are Getting a Raw Deal" explained that the "offer undervalues Ebix by at least 50%," and that Ebix should be valued at $28.00 per share.

94.    A May 2, 2013 *Technology Stock Advisor* article also concluded that the share price was $6 too low and cautioned that "[s]hareholders who agree to this takeover are selling way too low."

95.    The sale not only eliminates derivative liability for the individual defendants, it also nets Defendant Raina and his foundation, the Robin Raina Foundation (collectively the "Raina Investors"), tens of millions of dollars  in change-in-control premiums and increases Raina's ownership in the Company from 9% pre-merger to approximately 14% post-merger.  The Goldman Affiliates have also promised Raina continued employment as the Company's top executive.

96.    Individual Defendant Herter will also significantly benefit from the sale.  Herter is a director of the Rennes Foundation, which currently holds a substantial portion of common stock in Ebix – approximately 9%.  In connection with the execution of the Merger Agreement, the Rennes Foundation entered into a Rollover Letter Agreement together with Defendant Raina, under which it will exchange an undisclosed amount of its common stock for a 15% ownership interest in the Company post-merger.

97.    In addition to severely undervaluing the Company, the merger contains several provisions that unfairly favor the Goldman Affiliates.  For example, upon expiration of the forty-five day "go-shop" period, a strict "no

solicitation" provision governs.  Section 6.03 of the Merger Agreement prohibits the Individual Defendants from soliciting alternative proposals from other potential buyers and constrains the Individual Defendants' ability to communicate and negotiate with potential buyers who wish to submit or have submitted an unsolicited alternative proposal.

98.    Further, under Section 6.03(e) of the Merger Agreement, Ebix must advise Goldman affiliates of any other proposals or inquiries received from other parties within twenty-four hours of receiving such proposals or inquiries. Thereafter, Ebix must keep the Goldman affiliates "fully informed, on a current basis, of the status and details of any such Acquisition Proposal, indication or request."  The Merger Agreement gives Goldman access to any rival bidder's information thus giving Goldman the ability to top any competing offer.

99.    The Merger Agreement contains a restrictive "fiduciary out" in Section 6.03(d), which permits the Ebix Board to withdraw its approval of the merger under limited circumstances, but gives Goldman the opportunity to match any competing offer.

100.    Section 10.01 and 11.04 of the Merger Agreement provide for a termination fee of $15.54 million payable to Goldman if the Company pursues a competing offer during the "go-shop" period, and $27.19 million termination fee

if Ebix pursues a competing offer following the "go-shop" period or if Ebix otherwise fails to close on the transaction pursuant to the Merger Agreement. Ebix may also be obligated to reimburse the Goldman affiliates expenses in an amount up to $4.5 million.

## X.   CLASS ACTION ALLEGATIONS

101.   Plaintiff brings this action derivatively for the benefit of Ebix and as a Class action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of all other current holders of Ebix stock (excluding the Individual Defendants and any persons, firms, trust, corporations, or other entity related to or affiliated with them and their successors in interests) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

102.   This action is properly maintainable as a class action for the following reasons:

(a) The class is so numerous that joinder of all members is impractical. As of March 15, 2013, there were 37,147,313 shares of Ebix common stock outstanding, held by individuals and entities too numerous to bring separate actions. It is reasonable to assume that holders of Ebix stock are geographically dispersed throughout the United States.

(b) There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*,

- whether the current Ebix directors breached their fiduciary duties and other common law duties by putting their own financial interests ahead of the interests of Ebix shareholders;

- whether the current Ebix directors breached their fiduciary duties by failing to engage in any good faith negotiation with the Goldman Affiliates;

- whether the Ebix directors breached their fiduciary duties by undervaluing Ebix's valuable assets and business — including the value of its derivative claims—and accepting an unfairly-priced deal to protect themselves at the expense of Ebix and its shareholders;

- whether the Individual Defendants had a direct and disabling conflict of interest in considering the proposed transaction which would provide them with substantial compensation while simultaneously eliminating any potential liability in the derivative actions placing them in direct conflict with shareholders;

- whether the Ebix directors breached their fiduciary duties by agreeing to improper deal protection provisions with the Goldman Affiliates, while at the same time seeking to advance the Ebix director's own interests over those of the Company and its shareholders;

c) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff is a member of the Class, and Plaintiff's claims are typical of the other members of the Class. Accordingly, Plaintiff is an adequate representative and will adequately protect the interests of the Class.

d) Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

e) The current Ebix directors have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sough herein with respect to the Class as a whole.

f) Plaintiff has suffered damages and will continue to suffer additional damages as alleged herein, including but not limited to (a) damages representing the negative reaction to Merger and (b) the loss of millions

of dollars in shareholder value which would be derived from the shareholder derivative litigation already pending against the Individual Defendants.

g) The prosecution of separate actions would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Individual Defendants, and/or adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

## XI.   **DERIVATIVE ALLEGATIONS**

103.   Plaintiff brings this action derivatively for the benefit of Ebix to redress the breaches of fiduciary duty by defendants

104.   Plaintiff has no interest adverse to Ebix, and has hired counsel experienced in this type of litigation.

105.   At the time the action was initiated, the Board was comprised of the following six directors, all of whom are named as defendants herein: Raina, Eckert, Herter, Keller, Bhalla and Benz.

106.   Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful and useless act as at least half the Board is not disinterested.

107.   Demand is excused as to defendant Raina.  Defendant Raina is a member of management and violated the Company's Code of Ethics for Senior Financial Officers, as alleged herein.  In the Class Action, This Court upheld federal claims of securities fraud against Raina.  Under these circumstances, Raina is hopelessly conflicted and, due to his potential personal liability for securities fraud on these facts, could never consider a shareholder demand in a disinterested and independent manner.

108.   Demand is further excused because if the Director Defendants caused the Company to move forward with the derivative claims in this case, then the Company's efforts could undercut or even compromise the defense of the Class Action.  This excuses demand.

109.   Demand is excused because the Director Defendants, comprising the entirety of the current Board, failed to detect, prevent and halt the pervasive accounting problems that were occurring at Ebix, including the pervasive issuance of false statements to the shareholders, in the face of catastrophic problems that existed throughout the Company with respect to its internal control environment.

110.   Based on numerous warnings of internal control problems, the Director Defendants were on notice of, yet failed to remedy, the very internal control failures that led directly to the problems first disclosed in the Copperfield

report.  The Director Defendants knew that Ebix was engaged in a risky strategy of acquiring disparate companies from various geographic locations, and that the Company had experienced high turnover in its independent auditors, even while trying to integrate its many acquisitions.

111.   This failure to act in the face of multiple obvious "red flags" represented defendants' sustained and systematic failure to exercise their oversight responsibilities, such that, from a practical standpoint, no control environment existed at all nor has it ever been corrected by the Individual Defendants, as revealed by the Copperfield report, the Peak litigation and the Microsoft litigation. If anything, in the face of these mounting threats and breakdowns, the Director Defendants tried to <u>cut back</u> on resources devoted to the Company's audits by hiring cheaper, less sophisticated auditors, evidencing the Director Defendants' willful conduct.

112.   Demand is further excused because the conduct alleged herein, including the Director Defendants' permitting the Company to issue false statements to shareholders stretching over at least nine fiscal quarters, and in annual Proxy Statements was not the product of a valid exercise of business judgment and violated, among other duties, their duties of disclosure and candor. These SEC filings, including Forms 10-K, were approved  of and signed by each of

the current directors, falsely represented that the Company maintained an effective internal control environment, and that the Company's financial statements were accurate and free of misstatement.

113.   In addition, during the fiscal years at issue, the Director Defendants authorized the repurchase by the Company of more than 1.9 million artificially inflated shares of Ebix stock when they knew that the Company was issuing false statements to the market regarding its financial results and internal controls.  This is not a valid exercise of business judgment.  The conduct alleged herein, including the issuance of such false statements to shareholders and the repurchase of corporate stock, was so egregious on its face that board approval cannot possibly meet the test of business judgment.

114.   The Director Defendants actively participated in approving, reviewing and disseminating Ebix's materially false and misleading financial statements and SEC filings.  For example, each of the Director Defendants signed the fiscal year 2009, 2010, and 2011, Forms 10-K that Ebix filed with the SEC, which contained false statements regarding the Company's financial results, and false statements concerning the supposed adequacy of the Company's internal control environment—which was in truth materially degraded at the time of each said Form 10-K.

115.   As such, the Director Defendants are interested in the outcome of any inquiry or litigation concerning Ebix's false statements and face a substantial likelihood of liability based on their participation in the approval, review and dissemination of Ebix's false financial results and statements concerning the Company's internal controls to the shareholders.

116.   The Audit Committee Defendants, themselves comprising a disabling one-half of the Board, are incapable of considering a shareholder demand for the additional reason that each such director, by charter, bears direct responsibility for the Company's accounting and disclosure policies.  The Audit Committee Defendants knew about and approved the Company's tax holiday scheme challenged herein, particularly given its material impact on the Company's earnings.

117.   Furthermore, by charter, these directors were responsible for managing the Company's relationship with its independent auditor.  According to the Company's SEC filings, the Audit Committee "is directly responsible for the appointment, compensation, and oversight of the work of the Company's independent certified public accountants."  The Audit Committee Defendants breached their fiduciary duties by purposefully causing or permitting the Company

to woefully under budget for auditing services to hide and obscure the Company's manipulative accounting and disclosure conduct.

118.   The Audit Committee Defendants utterly failed to ensure the effectiveness of the auditing function at the Company, even after KPMG and BDO both sounded the alarm in 2004 that the Company suffered from material internal control deficiencies, as alleged herein.  Instead, the Company continued to have high auditor turnover.  These directors had special duties to ensure that appropriate measures were then taken to fix the Company's internal control environment, which they utterly failed to do.  As a result of these breaches of their duties, any demand upon the Audit Committee Defendants would be futile.

119.   Furthermore, the Director Defendants lack independence from defendant Raina, an undoubtedly interested party.  As set forth in the Copperfield report, Raina dominates the Company, controlling the Company's disclosures.  In a telling example of Raina's control over the Board, Raina's compensation has been materially increased in recent years, even as the stock price has materially declined.  For example, for fiscal year 2011, even after the revelations of misconduct alleged herein were revealed and the stock price lost 30% of its value, Raina was awarded over $3.4 million in compensation by the Board, an increase of $1 million over fiscal year 2009 and $500,000 over fiscal year 2010.

120.   The Director Defendants themselves receive material payments, benefits, stock options and other emoluments by virtue of their Board membership at Ebix, including hundreds of thousands of dollars a year in cash and stock awards as detailed in paragraphs 24-30.  Defendant Raina in particular owes his livelihood to the Company since it provides him with his principal occupation, having been paid approximately $9 million by the Company over the last three fiscal years alone.

121.   The amounts paid to these defendants, as alleged herein, are material to each of the defendants.  They will act to preserve and not threaten their positions of control and the perquisites thereof, and are therefore incapable of exercising independent objective judgment in deciding whether to bring the claims asserted in this action.

122.   Furthermore, demand is excused as to Defendant Herter because he is particularly beholden to Raina, having joined with Raina as one of the current directors who will retain an ongoing financial interest in the Company after the merger through the holdings of the Rennes Foundation ("Rennes") where he also sits as a director.  Herter is directly linked to Raina in connection with the sale of the Company, as Rennes entered into both a Voting Agreement and a Rollover Commitment with Raina.  Given his relationship with Raina, Herter is incapable of

exercising independent objective judgment in deciding whether to bring the claims

asserted in this action.

123.   Demand is excused as to Individual Defendants Herter, Bhalla, Keller,

Benz, and Eckert who improperly exercised stock options while in possession of

material information regarding with the undisclosed SEC investigation of the

Company's financial problems as set forth in paragraphs 31-32.

## COUNT I

### Derivative Claim for Breach of Fiduciary Duty against the Individual Defendants

124.   Plaintiff incorporates by reference the allegations set forth in the

preceding paragraphs.

125.   The Individial Defendants had a duty to ensure that Ebix disseminated

accurate, truthful and complete information to its shareholders.

126.   The Individual Defendants violated their fiduciary duties of care,

loyalty, and good faith, and the Code of Conduct, and defendants Raina and Kerris

violated the Company's Code of Ethics, by causing or allowing the Company to

disseminate to Ebix shareholders materially inaccurate information through, *inter*

*alia*, SEC filings and other public statements and disclosures.  They further caused

the Company to waste its assets by repurchasing more than 1.9 million shares of

Ebix stock at a time when the price was artificially inflated by materially false and

misleading statements.  These actions could not have been a good faith exercise of prudent business judgment.

127.   Furthermore, the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and when put on notice of problems with the Company's internal controls, to exercise good faith in taking appropriate action to correct the misconduct, and prevent its recurrence.  The Individual Defendants willfully ignored the obvious and pervasive problems with Ebix's internal controls alleged herein, and failed to make a good faith effort to correct the problems.

128.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

129.   As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Ebix has sustained significant damages, not only monetarily, but also to its corporate reputation and goodwill.

130.   As a result of the misconduct alleged herein, the Individual Defendants are liable to Ebix.

## COUNT II

## Contribution and Indemnification against the Individual Defendants

131.   Plaintiff incorporates by reference the allegations set forth above.

132.   Ebix is alleged to be liable to private persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability to Ebix.

133.   Ebix's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants.

134.   Ebix is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against Ebix by virtue of Individual Defendants' wrongdoing.

## COUNT III

### Violation of Section 14(a) of the Securities Exchange Act of 1934 against the Director Defendants

135.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.   Rule 14-A-9, promulgated pursuant to §14(a), provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14-A-9.

137.   The 2010, 2011, and 2012 Proxy Statements described herein violated § 14(a) and Rule 14-A-9 because they contained false and misleading statements regarding Ebix's corporate governance, risk management, and the accuracy of Ebix's financial statements.

138.   The misrepresentation and omissions in the 2010, 2011, and 2012 Proxy Statements were material and were an essential link in the reelection of the Individual Defendants, the ratification of CBH as Ebix's auditor, approval of the Stock Incentive Plan, and approval of the 2010 and 2011 executive officer compensation plan, as alleged herein.

139.   As a direct and proximate result of the foregoing violations of §14(a) and Rule 14-A-9, Ebix is entitled to preliminary and permanent equitable and injunctive relief, including, but not limited to, an order invalidating the shareholder vote on the Stock Incentive Plan.

## COUNT IV

### Class Action Claim for Breach of Fiduciary Duty in the Sale of the Company Against the Individual Defendants

140.   Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.   The Individual Defendants, as Ebix directors, owe the Class the utmost fiduciary duties of due care, good faith, and loyalty.

142.   The Individual Defendants have failed to fulfill their fiduciary duties in the sale of control of Ebix.

143.   The Individual Defendants also breached their fiduciary duties by favoring their own interests over those of the Ebix shareholders.  The Individual Defendants caused the Company to enter the Merger Agreement with the Goldman Affiliates at an unfair and inadequate price in order to perpetuate their own personal interests, because the merger with the Goldman Affiliates indemnifies the Individual Defendants from personal liability arising from their participation in the illegal conduct which is at issue in the derivative litigation already pending against the Individual Defendants and will ultimately eliminate that litigation without any recovery for the Company.

144.   Plaintiffs and the Class have no adequate remedy at law.

## COUNT V

### Class Action Claim for Breach of Fiduciary Duty in the Sale of the Company Against the Individual Defendants

145.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the proceeding paragraphs as if fully set forth herein.

146.   The Individual Defendants owe the Class the utmost fiduciary duties of care, good faith, and loyalty.

147.   The Individual Defendants are bound by their fiduciary duties to provide the Class with all the information material to the Class members' decision on whether to vote to accept the merger with Goldman.

148.   The Individual Defendants have breached those fiduciary duties by failing to disclose the processes, terms, and negotiations with other potential bidders for the Company.  The Ebix Directors have not disclosed who approached whom, who participated in the negotiation of the deal, any other unnamed potential acquirors, the terms of the offer, nor do they disclose what, if any, measures the individual defendants took to evaluate that offer.  These are all material facts which the Class must have in order to case a fully informed voted on the merger with Goldman.

149.   Plaintiffs and Class have no adequate remedy at law.

## COUNT VI

## Claim Against the Individual Defendants for Constructive Trust and An Injunction

150.   Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

151.   As set forth in greater detail above, the Ebix Directors and Goldman Affiliates entered into and approved the sale of the Company, whereby the Goldman Affiliates intend to merge with Ebix in a cash-for-stock transaction valued at $820 million.

152.   The Merger fails to make provisions for the valuable pending derivative claims of Ebix, which potentially will return to Ebix millions of dollars wrongfully taken from the Company by insiders through breaches of fiduciary duties.

153.   On account of such Merger, there exists an imminent threat to the standing of stockholders to continue to pursue the derivative claims on behalf of Ebix, and upon information and belief, the Individual Defendants are keenly aware and will argue that the Goldman Affiliates may serve to extinguish the derivative and class action claims against them.

154.   To protect and preserve the shareholder derivative claims, and to protect this substantial asset of Ebix, equity and good conscience requires that the Court recognize a  constructive trust over the derivative claims (or at least over the Individual Defendants' ill-gotten gains) for the benefit of Ebix shareholders, and that the derivative claims be assigned to Ebix shareholders.  Absent this relief, equity requires an injunction against the vote and the Merger.

155.   There is no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff, on behalf of Ebix, demands judgment against defendants and each of them jointly and severally as follows:

A.   determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of Ebix for said action;

B.   determining that this action is properly maintable as a class action and certifying Plaintiff as the representative of the Class;

C.   declaring that each of the defendants breached his fiduciary duty to Ebix;

D.   determining and awarding Ebix the damages it sustained as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

E.   directing Ebix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

F.      granting appropriate preliminary and permanent equitable and injunctive relief, including, but not limited to, an order invalidating the shareholder vote on the 2010 Ebix Stock Incentive Plan;

G.      awarding plaintiff the costs and disbursements of this action, including reasonable fees and costs to plaintiff's attorneys, accountants and experts;

H.      recognizing a construtive trust over the derivative claims, or at a minimum over the Individual Defendants' illegally-obtained proceeds, for the benefit of the Ebix shareholders;

I.      absent a constructive trust and assignment of the derivative claims to Ebix shareholders, enjoining the proposed Merger and any shareholder vote regarding the same, until such time that the derivative claims pending in this aciton are fully and finally resolved;

J.      assigning the derivative claims to Ebix shareholders;

K.      awarding Plaintiff injunctive relief and compensatory damages, together with pre-judgment and post-judgment interest; and

L.     granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted this 20th day of May, 2013.

*/s/ David A. Bain*
LAW OFFICES OF DAVID A. BAIN, LLC
DAVID A. BAIN
Georgia Bar No. 032449
1050 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia  30309
Telephone:   (404) 724-9990
Facsimile:    (404) 724-9986
dbain@bain-law.com
*Liaison Counsel for Plaintiff*

COHEN MILSTEIN SELLERS & TOLL PLLC
CHRISTOPHER LOMETTI
RICHARD A. SPEIRS
88 Pine Street, 14th Floor
New York, New York  10005
Telephone:   (212) 838-7797
Facsimile:    (212) 838-7745

COHEN MILSTEIN SELLERS & TOLL PLLC

DANIEL SOMMERS
ELIZABETH ANISKEVICH
1100 New York Avenue
Suite 500 West
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:    (202) 408-4699

*Lead Counsel for Plaintiff*


SCHUBERT JONCKHEER
  & KOLBE LLP
ROBERT C. SCHUBERT
WILLEM F. JONCKHEER
Three Embarcadero Center, Suite 1650
San Francisco, CA  94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161

PITTA & GIBLIN LLP
VINCENT PITTA
120 Broadway, 28th Floor
New York, New York  10271
Telephone:  (212) 652-3890
Facsimile:    (212) 652-3891

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2013, I electronically filed the

foregoing "CONSOLIDATED SHAREHOLDER DERIVATIVE AND CLASS

ACTION COMPLAINT" with the Clerk of Court using the CM/ECF system,

which will automatically send an e-mail notification of such filing to all attorneys

of record.

*/s/ David A. Bain*
LAW OFFICES OF DAVID A. BAIN, LLC
DAVID A. BAIN
Georgia Bar No. 032449
1050 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia  30309
Telephone:   (404) 724-9990
Facsimile:   (404) 724-9986
dbain@bain-law.com

*Liaison Counsel for Plaintiff*